THOMPSON, Judge.
This is the third time these parties have been before this court. B.S.L. (“the mother”) and S.E. (“the father”) have one child, S.D.E. (“the child”), who was born June 11, 1993. The relevant history of this case is set forth in this court’s opinion on the second appeal concerning these parties:
“The parties never married. At the time of the [January and May 2001] hearing[s] in this matter, the child was seven years old. On June 29, 1994, the trial court issued an order, based on the agreement of the parties, establishing the father’s paternity, awarding the mother primary custody of the child, awarding the father reasonable visitation, and ordering the father to pay child support.
“On May 19, 1999, the father filed a motion seeking immediate custody of the child. The trial court denied that motion and, treating the motion as one for a determination of dependency of the child, set a hearing for July 19, 1999. The trial court then entered an order postponing the July hearing, granting the father pendente lite custody of the child, and granting the mother visitation. On February 18, 2000, the parties entered into an agreement expanding the mother’s visitation, pending a final hearing. On January 23, 2001, May 8, 2001, *1217 and May 9, 2001, the trial court held hearings and received ore tenus evidence (hereinafter referred to as ‘the hearings’). On May 16, 2001, the trial court entered a judgment in which, among other things, it awarded custody of the child to the father. The trial court’s May 16, 2001, judgment did not find the child to be dependent. The mother appealed. B.S.L. v. S.E., 826 So.2d 890 (Ala.Civ.App.2002) (‘B.S.L. I’).
“In its May 16, 2001, judgment, the trial court made a number of specific findings of fact. Among those findings of fact, the trial court found that the standard set forth in Ex parte McLendon, 455 So.2d 868 (Ala.1984), did not apply to the case; that the mother, by her own admission, was not a fit parent at the time the father filed his May 19, 1999, petition for a modification of custody; and that at the time of the hearings, both parents were fit and proper parents. The trial court’s May 16, 2001, order states that the trial court ‘specifically reject[ed] joint legal custody as a result of the evidence which [was] presented which show[ed] a great deal of animosity between the parties and an unwillingness to compromise or set aside petty disputes.’
“In B.S.L. I, this court concluded that the hearings related to the issue of custody rather than to the issue of dependency, and, thus, the trial court should have applied the appropriate custody standard. B.S.L. I, 826 So.2d at 892. Because the mother had been awarded primary custody in the trial court’s June 29, 1994, order, this court concluded that the standard set forth in Ex parte McLendon, supra, was the appropriate standard to apply to the facts of the case. B.S.L. I, 826 So.2d at 892. Thus, this court concluded in B.S.L. I that the trial court in its May 16, 2001, judgment erred in applying the best-interest standard rather than the more stringent standard set forth in Ex parte McLendon, supra, in modifying its custody order as it relates to the child. This court reversed the trial court’s May 16, 2001, judgment and remanded the case for the trial court to apply the McLendon standard to the facts of the case. B.S.L. I, 826 So.2d at 892. On remand, the trial court, on April 4, 2002, entered an order finding that the father had met the standard set forth in Ex parte McLendon, supra, awarding custody of the child to the father, awarding the mother standard visitation, and ordering the mother to pay child support of $227 per month. The mother appealed].
“The trial court’s judgment based on evidence received ore tenus is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court abused its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. Ex parte Byars, 794 So.2d 345 (Ala.2001); Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ.App.1995). This ‘presumption of correctness is based in part on the trial court’s unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor.’ Littleton v. Littleton, 741 So.2d 1083, 1085 (Ala.Civ.App.1999). However, when a trial court improperly applies the law to the facts, the trial court’s judgment is not entitled to a presumption of correctness on appeal. Laminack v. Laminack, 675 So.2d 479 (Ala.Civ.App.1996).
“The trial court’s April 4, 2002, order states, in pertinent part:
“ ‘2. The court does find that circumstances changed from the rendition of [the] order on June 29, 1994, until the filing date of the petition for change of custody filed by the father *1218 herein on May 19, 1999, in that, the mother became unfit and at the time of the filing of this petition, May 19, 1999, she was an unfit parent due to her chronic addiction to, and abuse of, alcohol and drugs.
“‘3. The court does find further changed circumstances, in that, the child’s custody was awarded pendente lite to the father pending final hearing herein for a period well in excess of two (2) years, and that the child bonded with the father during that time.
‘“4. On the basis of all the evidence presented, and the changed circumstances found by the court, the court does find that it would materially promote the best interest of the child if her custody was awarded to her father, and that said change and the benefits therefrom far outweigh any inherent disruption as a result of change in custody and, therefore, it is in the best interest of the child that custody be awarded to the father.
“ ‘5. The court does further find that because of the length of time the child lived with the father under the pendente lite order, the inherent disruption presumed by law, in fact, does not exist in these circumstances.’ ”
B.S.L. v. S.E., 849 So.2d 182, 183-85 (Ala.Civ.App.2002) (plurality opinion) (“B.S.L. II”).
In B.S.L. II, the mother argued that the trial court erred in finding that the length of time the child had been in the father’s custody pursuant to the trial court’s pen-dente lite custody order relieved the father of his obligation to demonstrate, pursuant to the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984), that the benefits o'f the proposed change in custody would outweigh the disruptive effects of that change. This court agreed with the mother’s argument, finding that the award of pendente lite custody to the father did not alleviate his burden of presenting sufficient evidence to warrant a change of custody under the standard set forth in Ex parte McLendon, supra. B.S.L. II, supra. See also B.S.L. v. S.E., 826 So.2d 890, 893 n. 1 (Ala.Civ.App.2002)(“B.S.L. I ”)(“a pendente lite custody order does not shift the burden of proving the custody-modification standard set forth in McLendon from the father”). Therefore, this court reversed the trial court’s judgment and remanded the case for the trial court to properly apply the standard set forth in Ex parte McLendon. B.S.L. II, supra.
On remand, the trial court entered a judgment on March 12, 2003, that, among other things, again awarded custody to the father. In that judgment, the trial court determined that a change in custody would serve the child’s best interests and that the benefits of the change in custody would offset the inherent disruption caused by the custody change.. The mother timely appealed.
This court granted the mother’s motion to incorporate the records from the previous two appeals into the record for this third appeal. The record, as it currently exists on appeal in this matter, indicates the following. The mother was 37 years old at the time of the 2001 hearings in this matter. The mother had three children and had been married twice. The mother’s first marriage was to G.S.; that marriage lasted from 1983 until 1987. The mother and G.S. had one child, A.S., who was fourteen years old at the time of the hearings in this matter. The mother testified that, following her marriage to G.S., she was involved in a relationship with S.S. from 1989 until 1991. One child, L.L., was born of the mother’s relationship with S.S.; L.L. was 8 years old at the time of the hearings in this matter.
*1219 The mother and father’s relationship was brief. The mother and the father began living together in the spring of 1992. The parties separated in early 1993; at that time, the mother was approximately four months pregnant with the child. The child was born after the dissolution of the parties’ relationship. The mother married J.L. in August 1995. The mother and J.L. had been married six years at the time of the hearings in this matter. The mother testified that J.L. adopted L.L. in 1997.
The mother testified that the father was physically and verbally abusive during the time the parties lived together. The father admitted that on one occasion he punched a hole in the wall of the parties’ apartment during an argument with the mother. The mother testified that the father would often have his friends over to the parties’ apartment to play poker and that during that time he would drink alcohol and smoke marijuana. The mother testified that the father drank to excess during the time the parties lived together. According to the mother, she drank alcohol on occasion during the time the parties lived together but she never became intoxicated. The mother stated that she and the father often argued about his behavior.
Two of the father’s friends testified on the father’s behalf. One friend testified that he had visited with the father and the mother two or three times during the time they lived together and that he had never observed the father use illegal drugs, smoke, drink alcohol, play card games, or lose his temper. The other friend testified that he visited the parties’ apartment 15 to 20 times while the parties lived together and that he also had never obseryed the father use illegal drugs, smoke, drink alcohol, or physically or verbally abuse the mother or her children.
The child was born on June 11, 1993, following the parties’ separation. The mother testified that from the time of the parties’ separation until the child was eight months old the father was not involved in the child’s life. The mother testified that when the child was eight months old she left a picture of the child with one of the father’s friends and that after that the father contacted her. The trial court’s June 29, 1994, order awarded the father four weeks of summer visitation, one week of Christmas visitation, and alternate weekend visitation with the child. The mother testified that from June 1994 until June 1999 the father exercised only his alternate weekend visitation.
The mother testified that she and her current husband own their own home and that, at the time of the hearings, they had lived in the same residence for seven years. The mother testified that from 1997 until August 1999 she owned and operated her own cleaning business. The mother testified that, at the time of the hearing, she was working full-time for an electrical-supply company earning $9 per hour.
The mother admitted that for a time she had had some involvement with illegal drugs. She testified that she first tried cocaine in October 1998. The mother stated that from October 1998 until May 1999 she used cocaine six or seven times. The mother testified that she hid her drug and alcohol use from her friends and family. The mother testified that on the occasions that she used cocaine the children were with J.L. or the maternal grandmother. The mother testified that she would drive into the woods at night alone when she used cocaine. The mother stated that her cleaning business required her to work at night and that when she left her home in order to use cocaine she would tell J.L. that she was going to work.
*1220 The mother testified that in May 1999 she became aware that she suffered from a cocaine and alcohol addiction. According to the mother, in May 1999, before she received the father’s May 19, 1999, petition to modify custody of the child, she contacted the Mobile Infirmary regarding treatment for her addiction, but the hospital would not accept her health insurance. The mother testified that she voluntarily entered the Bradford Parkside facility in Birmingham (hereinafter “Bradford”) on June 25, 1999, in order to seek treatment for her drug and alcohol addiction. The mother testified that the inpatient program at Bradford lasted three weeks; that she completed the program in July 1999; and that she remained in an outpatient aftercare program at the time of the hearings in this matter.
The mother testified that one week before she entered Bradford, she contacted the father and asked if he would keep the child while she sought treatment. The mother testified that she and the father agreed that the father would return the child to the mother when she completed her three-week inpatient treatment at Bradford. The father acknowledged that around June 25, 1999, he agreed to care for the child while the mother sought treatment and to return the child to the mother when she returned from the three-week'inpatient program. The father admitted, however, that he failed to honor his agreement with the mother by not returning the child to her.
The mother stated that she has not used drugs or consumed alcohol since her treatment at Bradford. The mother testified that while at Bradford she was diagnosed with bipolar disorder and that she takes lithium and Remeron to treat that disorder. The mother testified that, since completing her inpatient treatment at Bradford, she has participated in Alcoholics Anonymous meetings and Cocaine Anonymous meetings, that she visits a psychiatrist once per month, and that she submits to random drug testing. The mother also testified that she currently acts as a sponsor to other individuals who are entering recovery at Bradford and that she speaks with both the families of individuals battling drug and alcohol addictions and the individuals themselves.
Dr. James Suess, a clinical psychologist who, at the time of the hearings, had practiced for 23 years, testified on behalf of the mother.[1] Dr. Suess testified that he first had contact with the mother in October 1999, following her treatment at Bradford.[2] Dr. Suess stated that he had a total of 17 counseling sessions with the mother, five sessions with the child, and a few sessions with the mother’s other two children and J.L. Dr. Suess testified that the mother never missed a counseling appointment with him.-
Dr. Suess testified extensively regarding the numerous tests he performed on the mother and his conclusions regarding those tests. Dr. Suess testified that, after performing the tests, he concluded that the mother did not have an addictive personality, but that she had been “medicating a bipolar disorder with drugs and alcohol.” Dr. Suess opined that as long as the mother kept taking her medication and maintained contact with her mental-health counselors the mother’s bipolar disorder would not affect her ability to properly parent the child.
*1221 Dr. Suess testified that the tests indicated that the mother had an average to high fluid IQ, that she acknowledged her drug and alcohol problem, and that she did not show signs of depression. Dr. Suess stated that, overall, the tests indicated that the mother was a dedicated mother who was aware that she had made mistakes. According to Dr. Suess, the mother was a fit and proper parent to have primary custody of the child.
Anthony Washington, the director of adult outpatient treatment at Bradford, testified on behalf of the mother. Washington stated that he began working with the mother on July 19, 1999, when she entered Bradford’s aftercare group program. Washington testified that the aftercare group meets one evening per week for one and one-half hours, that he had worked with the mother for nearly two years, and that the mother had rarely missed a meeting. Washington testified that when she did have to miss a meeting the mother called and notified Bradford in advance. Washington stated that to his knowledge the mother had not used alcohol or drugs since her inpatient treatment at Bradford. Washington confirmed that, during the time he worked with the mother, she had voluntarily spoken with other Bradford patients about her addiction and her recovery.
The mother testified that the child had always made all A’s in school. The mother entered copies of awards the child received for scholastic achievement from 1997 until the time of the hearings. The mother testified that while she had custody of the child she appropriately cared for the child and assisted the child with her homework. The mother testified that the father had not informed her of the child’s school activities from July 1999 until the time of the hearings.[3] The mother testified that she initiated contact with one of the child’s teachers and that she receives information about the child’s grades, conduct, and progress in school from that teacher. According to the mother, she had experienced difficulties exercising visitation while the father had pendente lite custody of the child.
A.S., the child’s half sister, testified at the hearings. A.S. testified that she was 14 years old, that she was in the ninth grade, and that she made all A’s and B’s in school. According to A.S., she was six or seven years old during the time the mother and the father lived together. A.S. testified that while the parties lived together the father lost his temper and raised his voice at the mother. She also stated that she had observed the father while he was intoxicated and that he drank to excess primarily on the weekends. A.S. testified that on one occasion she observed the father punch a hole in the wall of the parties’ apartment when he became upset with the mother. A.S. stated that on another occasion the father became upset and threw L.L.’s and her toys and L.L.’s playpen out of the apartment and that that event had frightened her.
A.S. testified that, even before the mother entered Bradford, the mother cared for the children appropriately. According to A.S., the mother washed their clothes, helped them with their homework, and was involved in their school activities. A.S. testified that until the mother informed her she was not aware that the mother had suffered from an alcohol and drug addiction. A.S. also testified that she had not *1222 observed her mother consume any alcohol since she had returned from Bradford. AS. stated that when they were at their mother’s house she and the child watched movies together and that she would read books to the child. A.S. testified that the child was happy when she visited with the mother and that sometimes the child would cry when she had to return to the father.
G.S., the mother’s former husband, testified that the mother was a good mother. G.S. testified that during his marriage to the mother he had observed the mother consume alcohol but that he had never seen the mother become intoxicated.
V.L., a business acquaintance of the father’s, testified that he attended a New Year’s Eve party (hereinafter “the party”) on December 31, 2000, and that the mother was present at the party. According to Y.L., he did not know the mother’s identity until the father, who was also present at the party, pointed her out to him. V.L. testified that at the party he observed the mother sitting at a large table with a group of friends and that he was seated two tables away from the mother. V.L. testified that during the party he observed the mother with a Miller Lite beer can in her hand and that he observed her take one drink out of the can. V.L. did not see the mother consume any other alcohol during the evening. V.L. testified that during the party he had a brief, two-minute conversation with the mother. V.L. stated that he could smell alcohol when he was standing near the mother and her friends and that he thought the mother was intoxicated. V.L. admitted that he had also consumed alcohol during that evening.
V.L. testified that he had a camcorder with him during the party and that he filmed the mother and her friends for a few minutes. V.L. testified that the videotape he recorded during the party did not depict the mother consuming alcohol. V.L. explained that he did not videotape the mother taking the drink of beer because the battery on his camcorder had died. V.L. testified that he no longer had the videotape that depicted the party. According to V.L., the week before he testified at the hearings he gave the videotape to the father.
The father testified that he also attended the party. The father testified that he watched the mother during the night of the party and that he never observed her consume any alcohol. According to the father, he had V.L.’s videotape and that the videotape did not depict the mother consuming alcohol. The father did not attempt to enter the videotape into evidence at the hearings.
Five friends of the mother’s testified on her behalf; those individuals’ friendships with the mother varied in length between 2 and 12 years. Four of the mother’s friends testified that they had attended the party and that they were seated at the same table with the mother during the party. All four individuals testified that the mother did not consume any alcoholic beverages during the evening, that she consumed only a soda and sparkling grape juice, and that she was the designated driver for the evening. Four of the mother’s friends testified that on the occasions that they socialized with the mother during their friendship, they had never observed the mother intoxicated or drinking excessively. The friends stated that they had not observed the mother consume any alcohol since she had completed her treatment at Bradford.
J.L., the mother’s current husband, testified that the mother had not used drugs or consumed alcohol since she was released from Bradford. J.L. stated that the mother did not consume any alcohol at the party.
*1223 The father testified that he had worked for the same employer for one year and eight months and that he generally worked 50 hours per week. The father testified that he married K.E., his current wife, on January 28, 2000, and that, at the time of the hearings, he and K.E. were expecting a child. The father stated that K.E. also had a four-year-old son from a previous marriage. According to the father, at the time of the hearings in this matter, he, K.E., her four-year-old son, and the child lived together in a mobile home. The father testified that the child has her own bedroom in the mobile home.
The father stated that he was involved in the child’s school activities. The father testified that during the time he has had custody of the child the paternal grandmother has taken the child to and retrieved her from school. The father explained that he picks the child up from the paternal grandmother’s house when he has finished work.
The father admitted that while the child was in his custody the child did not wear a helmet when she rode her bicycle and that she only sometimes wore a helmet when she rode an all-terrain vehicle (“ATV”). The father testified that on one occasion the child fell off the ATV while the ATV was being driven by the neighbor’s 14-year-old son; the father stated that the child was not wearing a helmet on that occasion. The father testified that the child was no longer allowed to ride the ATV unless the father was driving.
The father testified that the mother exercised all of her court-ordered visitation during the pendency of his petition and that she always timely returned the child following her exercise of visitation. The father stated that the mother loved the child but that he did not think that the mother should have primary custody of the child because, by her own admission, she had suffered from a drug and alcohol addiction and because V.L. had observed her take a drink of a. beer at the party. According to the father, at the time of the hearings, he did not have a problem with the mother having custody of the child; however, the father stated, he was worried that the mother would return to using drugs in the future. The father admitted to drinking alcohol, but he stated that he does not drink to excess.
The maternal grandmother testified that the mother and the child love one another and that the mother and the child have a good relationship. The maternal grandmother testified that the child has a good relationship with J.L., the child’s stepfather, and with A.S. and L.L., the child’s half sisters. According to the maternal grandmother, a few months before the hearings she observed a photograph of the child and the father. The maternal grandmother testified that there was a dead deer in the background of the photograph and that the child had blood smeared on her cheeks. The maternal grandmother testified that she questioned the child about the incident and that the child told her that she did not enjoy the incident. The father admitted smearing the dead deer’s blood on the child’s cheeks. The father stated that the child was six years old at the time he placed the deer blood on her cheeks and that he did not think that there was anything wrong with placing the blood of a dead animal on the child’s cheeks.
The mother argues on appeal that the father failed to meet the burden set forth in Ex parte McLendon, 455 So.2d 863, necessary to justify a change in custody, and, thus, she argues, the trial court erred in awarding the father custody of the child. When there has been a previous judgment granting custody to one parent, or if one parent has given up legal custody, *1224 then custody will be changed only if the parent seeking modification proves that there has been a material change in circumstances since the prior judgment, that the child’s best interest will be materially promoted by a change of custody, and that the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, 455 So.2d at 866. “[A] change of custody from one parent to another is not a decision to be made lightly. On the contrary, it may be granted only where the evidence discloses an obvious and overwhelming necessity for change of custody.” Glover v. Singleton, 598 So.2d 995, 996 (Ala.Civ.App.1992); see also Ex parte Peppers, 703 So.2d 299, 302 (Ala.1997). The evidence presented by the parent seeking to modify custody “ ‘must be so substantial as to show an obvious and overwhelming necessity for a change.’ ” B.S.L. I, 826 So.2d at 893 (quoting Vick v. Vick, 688 So.2d 852, 855 (Ala.Civ.App.1997)). “When there are ‘equal advantages and disadvantages to living with either the mother or the [father],’ then moving the child cannot be said to materially promote the welfare of the child.” Trusty v. Newton, 678 So.2d 1173, 1175 (Ala.Civ.App.1996) (quoting Ex parte Couch, 521 So.2d 987, 989 (Ala.1988)).
The father’s own testimony establishes that the sole basis for his petition to modify custody was the mother’s drug and alcohol addiction. The mother admitted that between October 1998 and May 1999 she had used cocaine six or seven times and that she had an alcohol problem. The mother voluntarily committed herself to a treatment facility to address her addictions. The mother testified that she had not consumed alcohol or used drugs since she had completed her inpatient treatment at Bradford, nearly two years before the hearings. Although a friend of the father’s testified that he observed the mother take one drink of a beer at a December 31, 2000, New Year’s Eve party, seven other witnesses, including the father, testified that they did not observe the mother consume any alcohol that evening.
The mother presented evidence that the child’s grades and performance in school remained consistent from 1997 until the time of the hearings. A.S., the child’s 14-year-old half sister, testified that during the time before the mother entered treatment at Bradford the mother properly cared for the children and that she assisted the children with their homework. The mother’s current husband; A.S., the mother’s 14-year-old daughter; the maternal grandmother; and five of the mother’s friends testified that they had never observed the mother use drugs, that they were unaware of the mother’s alcohol and drug addiction until she sought treatment, and that they had not observed her consume alcohol since she had completed her treatment.
The record indicates that the mother quickly recognized her problem, voluntarily sought treatment, and had been successful in her recovery for the two years preceding the hearings. This court recognizes the ore tenus presumption in favor of the trial court’s decision; however, “we are not constrained to affirm a judgment of the trial court when the evidence fails to support the findings upon which that judgment is based.” Sloane v. McQuinn, 836 So.2d 908, 910 (Ala.Civ.App.2002) (citing Andrews v. Andrews, 495 So .2d 688 (Ala.Civ.App.1986)). We conclude that the fa ther failed to present sufficient evidence demonstrating a material change in circumstances since the entry of the trial court’s June 1994 judgment, such that the child’s best interest would be materially promoted by a change in custody and the positive good brought about by the change *1225 would more than offset the inherent disruption caused by the change. Thus, we must reverse the trial court’s judgment modifying custody of the child to the father.
The decision of the trial court is reversed, and the cause is remanded for the entry of an order consistent with this opinion.
REVERSED AND REMANDED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result.

. The parties stipulated to the fact that Dr. Suess was a qualified expert in the field of child, adolescent, and family psychology.

. Dr. Suess testified that his first session with the mother was a follow-up session from her treatment with Dr. Harrell, the mother’s psychiatrist at Bradford.

. K.E., the father’s current wife, testified that she informed the mother of the child’s "major” school events. K.E. stated that she had informed the mother of the child's Thanksgiving play over the telephone. According to K.E., the mother did not attend the play and her„failure to attend upset the child.