PER CURIAM.
T.C.T.B.M. (“the mother”)[1] appeals from a judgment of the Mobile Juvenile Court that modified custody of the parties’ child, awarded the mother visitation with the child, and ordered the mother to pay child support. We reverse and remand with instructions.
L.T. (“the child”) was born out of wedlock in January 2005 to the mother and B.T. (“the father”); the mother and the father never married. As a result of a paternity and child-support action filed by the mother, the juvenile court entered a judgment on November 17, 2005, in case no. CS-05-5392, that adjudicated the father to be the father of the child, set the father’s monthly child-support obligation at $199 a month, and awarded the father “standard” visitation with the child; however, the father was required to exercise overnight visitation with the child at the paternal grandparents’ home. On December 5, 2008, in case no. JU-08-114.91, the father filed a petition to modify the visitation provisions set forth in the November 2005 judgment. On February 11, 2009, the father amended his petition to modify visitation in case no. JU-09-114.91, and he sought an order modifying custody of the child.[2]
*413 After conducting an ore tenus hearing, the juvenile court entered an order on October 21, 2009, that stated that it had found that there had been a material change in circumstances since the entry of the November 2005 judgment; however, the juvenile court did not enter a final judgment, and it requested that the child’s guardian ad litem make the child’s pediatric and counseling records available to the court. The juvenile court awarded temporary joint legal and physical custody of the child to the mother and the father pending entry of its final judgment. On November 30, 2009, the juvenile court entered a judgment that found that the father had met his burden set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984), and physical custody of the child was transferred to the father. The judgment also awarded the mother standard visitation with the child and set her child-support obligation at $344 a month.
The mother filed a motion to alter, amend, or vacate the juvenile court’s judgment, pursuant to Rule 59, Ala. R. Civ. P. In her motion, the mother challenged the juvenile court’s finding that the father had met his burden of proof pursuant to Ex parte McLendon, the award of standard visitation, and the calculation of her child-support obligation. The mother’s post-judgment motion was denied by operation of law, and she timely appealed.[3] See Rule 1(b), Ala. R. Juv. P.
The mother presents three issues for this court to review on appeal: (1) whether the juvenile court erred in determining that the father met his burden of proof pursuant to the custody-modification standard set forth in Ex parte McLendon; (2) whether the juvenile court erred in awarding the mother only standard visitation with the child; and (3) whether the juvenile court erred in its computation of her child-support obligation.
The following pertinent facts were presented to the juvenile court. The mother, who was 29 years old at the time of the final hearing, testified regarding a visitation dispute between her and the father. According to the mother, during the summer of 2008, she and the father agreed that the father could exercise overnight visitation with the child at the father’s home, despite the restriction set forth in the November 2005 judgment. However, on November 21, 2008, the mother filed a petition for protection from abuse against the father after the child complained after visitation with the father that the father had hit him in the stomach and had made his “food come up.” According to the testimony of the parties, a hearing on the mother’s petition for protection from abuse was held on December 17, 2008, and the mother voluntarily dismissed her petition on the condition that the father abide by the November 2005 judgment, which restricted his overnight visitation with the child to be spent at the paternal grandparents’ home. The mother did not dispute that the father missed two weekend visits with the child as a result of her petition for protection from abuse. The mother stated that the father had not missed any visits with the child since that time.
At the time of the final hearing, the child was enrolled in school in a pre-kin-dergarten program. According to the mother, the child’s grades were wonderful, *414 the child was learning French, and the child was doing “fabulous” at that school. The father stated that he wanted the child to go to a different school, one that was known for their educational facilities; however, the father admitted that he was not familiar with the child’s school on an educational level.
The father testified that the mother regularly changed religious affiliations while he was in a relationship with her — i.e., before the entry of the November 2005 judgment — but that he never discussed the mother’s religious beliefs with her because, he said, “[i]t [is] up to an individual to seek what they think is the truth.” The father submitted an article from a local magazine, that appeared in the October 26, 2005-November 8, 2005 issue of the magazine, that featured the mother.[4] In the article, the mother discussed her religious affiliations, but the mother alleged at the final hearing that the local magazine had misquoted her. The father stated that he did not attend a church.
The mother again changed religious affiliations in June 2007. At the time of the final hearing, the mother had been married for almost two years and she and her husband had a 13-month-old child. The mother met her husband on a Web site around July 2007, and they married in January 2008.[5] The mother stated that the child had spent only two days around her husband before they married. However, according to the mother, her husband and the child had a good relationship and the father had never expressed any complaints about her husband. The mother also stated that her two children got along very well.
The mother testified that she had difficulty communicating with the father because he would not speak to her on the telephone and would only communicate via text messages. The father stated that he would not talk to the mother on the telephone because she had a reputation for being untruthful and because he wanted everything that she said to be in writing. However, he stated that he would promote telephone contact between the child and the mother if he was awarded custody of the child.
The mother stated that she had congenital optic neuropathy with a nystagmus, which basically means that she has poor depth perception; for that reason, she is unable to obtain a driver’s license. However, the mother stated that her condition was not degenerative and that, other than her inability to drive, her condition did not affect her everyday life. She stated that she relied on her husband and her mother for transportation. At the time of the final hearing, the mother worked approximately 20 hours each week at a therapeutic massage parlor, and she earned approximately $1,500 a month. The mother stated that she worked on Mondays from 1:00 p.m. to 6:00 p.m., on Thursdays from 10:00 a.m. to 5:00 p.m., on Fridays from 9:00 a.m. to 3:00 p.m., and on “some” Saturdays or Sundays.
The mother began taking the child to a counselor in December 2008 after the child told her that the father had hit him in the stomach and had made his “food come up.” The mother stated that the child had had *415 nightmares and horrible screaming fits on Sunday nights after he returned from weekend visitation with the father. The mother stated that she paid the child’s counselor $100 for each visit and that she could not afford to take him twice a month. However, even including the child’s school tuition, which was $270 a month, the mother agreed that her monthly income exceeded her monthly expenses. The evidence indicated that the child was not under any course of treatment with his counselor and that the counselor only saw the child to check his progress.
The mother stated that she did not use illegal drugs and that she did not drink alcohol. The mother stated that the father had never expressed any concerns about the way that she raised the child. The father indicated that he thought that the mother might try to take the child out of the country,[6] apparently because the mother had sought his help in obtaining a passport for the child. The mother stated that she had asked the father about getting a passport for the child so that she and the child could visit the mother’s friend in Canada.
The mother stated that she and her mother, the maternal grandmother, were the subject of an investigation by the Alabama Department of Human Resources (“DHR”) in January 2008 after the child, who was three years old at the time, was found “wandering” down the street from the maternal grandmother’s home. However, the mother stated that she was not at her mother’s home at that time and that no one from DHR ever interviewed her about the incident or otherwise did any follow-up to the investigation. The child’s counseling records indicated that the child’s counselor had filed a report with DHR in December 2008 concerning the allegations of abuse made by the child that implicated the father. According to the child’s records, DHR had assigned a caseworker to investigate the father, but nothing in the record on appeal indicates that the father was found to have abused the child.
The father testified that, since the entry of the November 2005 judgment, he had graduated from college with a degree in engineering and had found employment earning approximately $26 an hour. According to the father he was required to work 40 hours a week, which he typically fulfilled from 8:00 a.m. to 5:00 p.m., Monday through Friday. The father bought a three-bedroom, two-and-one-half-bathroom home in February 2008, and, at the time of the final hearing, the father had one roommate, a man who was a manager of an anesthesiologist group at a local hospital. The father testified that he had never hit or injured the child, that he had a great relationship with the child, and that he had unilaterally increased the amount of child support that he paid to the mother from $199 a month to $325 a month in January 2008.[7]
The father stated that he had an extensive family network in the Mobile area that could assist him in caring for the child. The mother’s family-support system apparently consisted of her husband, her mother, her stepfather, her grandfather, and her aunt. He stated that the last time he spent time with the mother’s mother, she had used prescription medication, alcohol, and marijuana. However, he stated that he had not seen the mother’s family *416 since his relationship with the mother ended in April 2005.
The father stated that he sought custody of the child because he felt like he could provide a more stable environment for the child and because he wanted to spend more time with the child. The father stated that he was what had changed since the entry of the November 2005 judgment. He stated that his environment would be better for the child because he lived in a good neighborhood close to schools and a hospital. He stated that the child’s life would be improved because the child would have a set schedule, because he would be available for the child on the weekends, and because he had a driver’s license.
We find the mother’s first issue, whether the father met his burden pursuant to Ex parte McLendon, dispositive of her appeal. This court’s standard of reviewing a judgment modifying custody is well settled:
“When evidence in a child custody case has been presented ore tenue to the trial court, that court’s findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing.”
Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).
In its final judgment, the juvenile court did not set forth any specific findings of fact to support its determination that the father had met his burden pursuant to Ex parte McLendon. Thus, this court must assume that the juvenile court made findings of fact that would support its judgment, unless those findings would be clearly erroneous. Ex parte Bryowsky, 676 So.2d at 1324.
Pursuant to Ex parte McLendon, the father, as the party petitioning to modify custody of the child, was required to prove (1) that he was a fit custodian, (2) that a material change in circumstances affecting the welfare of the child had occurred since the entry of the November 2005 judgment, and (3) that the change in custody would materially promote the best interest and welfare of the child so that the inherently disruptive effect of the proposed change in custody would be outweighed by the positive good resulting from the change. 455 So.2d at 865-66.
Regarding the “material-promotion” prong of the Ex parte McLendon standard, our supreme court has explained:
“ ‘[This] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child’s healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court’s satisfaction that material changes affecting the child’s welfare since the most recent decree demonstrate that custody should be disturbed to promote the child’s best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.’
“Wood v. Wood, 333 So.2d 826, 828 (Ala. Civ.App.1976).
“It is not enough that the parent show that [he] has ... reformed h[is] lifestyle, and improved h[is] financial position. Carter v. Harbin, 279 Ala. 237, 184 So.2d 145 (1966); Abel v. Hadder, 404 So.2d 64 (Ala.Civ.App.1981). The par *417 ent seeking the custody change must show not only that [he] is fit, but also that the change of custody ‘materially promotes’ the child’s best interest and welfare.”
455 So.2d at 865-66.
After a careful review of the record, we conclude that the father faded to meet this burden. The father presented evidence indicating that he could provide a stable home environment for the child. However, the father presented no evidence indicating that the child was living in an unstable environment in the mother’s home, or that the mother did not provide the child with a schedule. Although the father argued that his work schedule allowed him to be available for the child on the weekends, we cannot conclude that the positive good brought about by the father’s ability to spend the entire weekend with the child was sufficient to overcome the inherently disruptive effect that a change in custody would have on a four-year-old child who had lived primarily with the mother since his birth.
The father also presented evidence indicating that the child would benefit by living with him because the father had a driver’s license and the mother did not. However, there was no evidence indicating that the mother’s inability to obtain a driver’s license affected the child in any way. The mother presented undisputed evidence indicating that her husband and her mother met her transportation needs, and there was no indication that they could not do so in the event of an emergency. Furthermore, although the father testified that he wanted to enroll the child in a school that was well known for its educational facilities, the father presented no evidence indicating that the school that the child attended at the time of the final hearing did not provide the child with a good education; in fact, the father admitted that he was not familiar with the child’s school on an educational level. The father did not present any complaints about the mother’s ability to raise the child, her parenting techniques, her husband, or even her oft-changing religious affiliations.
“We readily acknowledge that the trial court was in the best position to evaluate the credibility of the witnesses. See Fell v. Fell, 869 So.2d 486, 494 (Ala.Civ.App. 2008) (noting that the trial court is in the unique position to directly observe the witnesses and to assess their demeanor and credibility). Although it was certainly within the province of the trial court to determine the credibility of the witnesses and to shape its judgment accordingly, that judgment must be supported by the evidence. See Judah v. Gilmore, [804 So.2d 1092 (Ala.Civ.App. 2000) ].”
Bishop v. Knight, 949 So.2d 160, 167 (Ala. Civ.App.2006).
There was much disputed testimony at the ore tenus hearing, and, as stated above, the juvenile court was in the best position to resolve those disputes. However, the fact remains that the record lacks evidence to support a finding that the child’s best interests would be materially promoted by the change in custody. Because we conclude that the juvenile court’s judgment modifying custody of the child is unsupported by the evidence, we must reverse the judgment that awarded custody of the child to the father.[8] In light of the foregoing, we also remand the case with instructions to vacate the portions of the judgment that transferred custody of the child to the father, awarded the mother *418 visitation, and ordered the mother to pay-child support.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Ail the judges concur.

. The mother's name appears in the record a number of different ways. We have chosen to use initials reflecting the version of the mother’s name that appears in the juvenile court’s final judgment.

. We conclude that the juvenile court properly exercised jurisdiction to modify its November 2005 judgment. Before the enactment of the current Alabama Juvenile Justice Act ("the AJJA”), § 12-15-101 et seq., Ala.Code 1975, which became effective on January 1, 2009, the juvenile court had continuing jurisdiction to modify a custody judgment made in conjunction with a paternity action pursuant to former § 12-15-32, Ala.Code 1975, and former § 26-17-10(e) Ala.Code 1975. See W.B.G.M. v. P.S.T., 999 So.2d 971, 974-75 (Ala.Civ.App.2008). Both former § 12-15-32 and former § 26-17-10(e) were repealed when the AJJA became effective. See Act No. 2008-2779(a), Ala. Acts 2008; and Act No. 2008-376, Ala. Acts 2008, § 1. Pursuant to § 12-15-117(a), Ala.Code 1975, a provision in the AJJA, the juvenile court now retains continuing jurisdiction only over cases in which “a child has been adjudicated dependent, delinquent, or in need of supervision....” Because the father filed an action to modify the November 2005 judgment in December 2008, before the enactment of the AJJA, we conclude that the juvenile court retained jurisdiction to modify its November 2005 judgment.

. Throughout the proceedings below, the juvenile court and the parties used both case numbers, JU-09-114.91 and CS-05-5392, to refer to the action initiated by the father on December 5, 2008, and assigned case no. JU-09-114.91. The mother’s appeal was docketed by the clerk of this court as an appeal from JU-09-114.91 and CS-05-5392. Although some of the pleadings and the judgment list both case numbers, the judgment in case no. JU-09-114.91 is what is actually being appealed by the mother.

. We note that this article was published before the entry of the November 2005 judgment, and nothing in the record indicates that the father became aware of this article only after the entry of the November 2005 judgment.

. According to the mother, she was married once before she married her current husband. That marriage lasted approximately six months. According to the mother, she divorced her first husband because he was careless with firearms around the child.

. The mother’s husband is not an American citizen, but, at the time of the final hearing, he had a "green card.”

. The father’s child-support obligation was subsequently increased, apparently by a court order, to $450 a month.

. Because the custody-modification issue is dispositive of the mother's appeal, we preter-mit discussion of the remaining issues presented by the mother on appeal.