PER CURIAM.
The Alabama Supreme Court has repeatedly held that improved circumstances of a noncustodial parent, without more, are insufficient to warrant a change in physical custody of children. Stephen P. Johnson ("the father") appeals from a judgment of the Baldwin Circuit Court ("the trial court") granting the petition of Sara W. Johnson ("the mother") to modify a judgment that had awarded sole physical custody of the parties' two children to the father. Because the evidence presented to the trial court was not sufficient to modify the physical custody of the children, we reverse the judgment.
Procedural History
The father and the mother had two children during their marriage. C.J. ("the daughter") was born on September 15, 2010, and W.J. ("the son") was born on May 11, 2012 (C.J. and W.J. are hereinafter sometimes referred to collectively as "the children"). The parties were divorced in September 2015 following a trial. In the divorce judgment ("the September 2015 judgment"), the trial court ordered that the mother and the father would share joint legal custody of the children. The father was granted sole physical custody, and the mother was granted specified *1231 rights of visitation with the children.[1]
In November 2016, the mother filed a petition in the trial court seeking to modify physical custody of the children. A trial was held on May 3, 2017, less than two years after the entry of the September 2015 judgment. On June 7, 2017, the trial court entered a judgment modifying the September 2015 judgment by granting the mother sole physical custody and granting the father rights of visitation with the children ("the custody-modification judgment"). In the custody-modification judgment, the trial court stated, in part:
"On May 3, 2017, the Court conducted a hearing on the merits on the [mother's] [petition] to modify physical custody of the two children of the parties, a girl (C.J.)[, age] 6[,] and a boy (W.J.)[, age] 4. In the Judgment of Divorce (entered September 1, 2015), this Court awarded joint custody to both parties, with the [father] being awarded primary physical custody, subject to visitation rights of the [mother].
"In awarding custody to the [father] following the divorce trial, the Court considered the fact that the [mother] had an addiction which resulted in the divorce, but had been to treatment, had been in recovery and had seemingly thrown off her addiction. However, at the time of the trial she had been clean for only eight months. Had there been a longer period of time, sufficient for the Court to determine that in all probability she would not relapse, the Court, considering the ages of the children and all other relevant factors[,] would have awarded custody to the [mother].
"At the time of this hearing, [the mother] has been successful in her recovery for over two years. She is also now a leader in the recovery community and actively assists others with problems of addiction. The Court finds that both parties are excellent parents, love and nurture their children and are well able to provide for them. The Court finds, however, that the remarriage of the [father], and the addition of three new children to the household (for a total of six, ages 13, 12, 9, 6, 6 and 4, making C.J. and W.J. the youngest in the home),[2] are important factors for the Court to consider and represents a material change in circumstances.
"The Court finds that the [mother] is in a position to devote more time to these younger children and that considering all of the circumstances a change in custody to the mother would materially promote the best interests of the children, more than offsetting any inherently disruptive effect caused by the change, thereby meeting the three-pronged test set forth in Ex parte McLendon, 455 So.2d 863 [ (Ala. 1984) ].
"This is not an easy decision for the court to make, but it seems apparent that the mother is able to devote more time and attention to these young children who need considerable attention at this time in their lives. The father is a prominent full-time practicing attorney and has depended upon a nanny to assist with child care. The mother, also an attorney, has a flexible schedule and would not be dependent upon someone *1232 to raise the children. Additionally, the recent addition of a step-mom (who is a full time business owner/operator) and three more children present new challenges for the household of the [father]. It is impossible for this Court to see how the two minor children would not receive more time and attention from the [mother] which would materially promote the best interests of the children.
"It is therefore ORDERED that the [petition] to modify is hereby GRANTED and custody of the minor children C.J. and W.J. is hereby awarded jointly to the parties, with primary physical custody being awarded to the [mother], subject to the rights of visitation of the [father] set forth in Schedule 'A' attached hereto."[3]
"Schedule A" referenced in the trial court's custody-modification judgment grants the father visitation with the children every other weekend and specified visitation during the summer and on holidays.
The same day the custody-modification judgment was entered, the father filed a motion to alter, amend, or vacate that judgment, pursuant to Rule 59, Ala. R. Civ. P. On June 21, 2017, the father filed an amended motion seeking to alter, amend, or vacate the custody-modification judgment.
On June 30, 2017, the father filed in the trial court a motion seeking to stay enforcement of the custody-modification judgment pending an appeal. The trial court held a hearing on both of the father's motions, and, on July 13, 2017, the trial court entered an order denying the father's postjudgment motion and the motion to stay. The father then filed his notice of appeal to this court, and, on July 25, 2017, the father filed in this court a motion to stay the implementation of the custody-modification judgment. On August 4, 2017, this court issued an order that entered a stay and explained that, in determining whether to enter a stay in a proceeding involving the custody of children, this court considers
"(1) [w]hether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the 'best interests' of the child would be served by the stay."
See also Ex parte Krukenberg, 252 So.3d 676, 678 n. 1 (Ala. Civ. App. 2017) (discussing the factors considered by this court when considering a motion to stay).
Facts
The entirety of the evidence presented in support of the custody-modification judgment includes an 82-page transcript; exhibits submitted by the mother consisting of a picture of the house recently purchased by the mother's aunt, the mother's tax returns, and various pictures of the mother and the children; and exhibits submitted by the father, consisting of pictures of himself with the children, pictures of the children's bedrooms, and documentary evidence of text messages between himself and the mother.
The mother testified that she had been employed as an attorney working for her aunt earning between $60,000 and $66,000 annually. The mother testified she was currently living in a rental house but that *1233 she anticipated moving into a three-bedroom house that her aunt had recently purchased once the city approved a permit. The mother testified that she and her aunt intend to add three bedrooms and bathrooms to the house.
The mother testified that she attends approximately three Alcoholics Anonymous ("AA") meetings each week. When asked who would care for the children while she attended meetings, the mother testified: "[W]hen I have the children, I frequently don't go to meetings." The mother then testified that, if granted custody, she would still "absolutely" need to go to AA meetings and that she has "a roomful of people who would all be willing to babysit" so that she could attend meetings.
The mother also testified that she volunteers at two substance-abuse treatment facilities for women. At one facility, she teaches yoga and serves on the board of directors. At the other facility, she sponsors women as they prepare to transition into a sober lifestyle. The mother testified that she had been involved in various charitable programs related to helping individuals with substance-abuse recovery, developmental disabilities, and special needs.
The mother testified that the father had not included her in decisions involving the children. The mother testified that the father had the children baptized in the Catholic Church but did not inform her until shortly before the baptism occurred. The mother also testified that the father had enrolled the daughter in a Catholic school without consulting the mother. Although the father had not sought the mother's input in making those decisions, the mother testified that she had been very involved in the children's school and preschool and had attended most school-related activities.
When asked what she would be able to do if granted sole physical custody of the children, the mother testified: "I would be able to spend all the time necessary with them. I would be the one to fix their breakfast, get them dressed for school, take them to school, volunteer at the school, pick them up from school, transport them to and from activities."
The mother testified that the son had "been increasingly acting out," that the children's manners had been "worsening," and that their language had "become of increasing concern." The mother also testified that she was concerned that the daughter and the father's fiancée's six-year-old son had taken inappropriate pictures on an iPad tablet computer.
The mother's testimony indicated that, although she did not believe the father was responsible for teaching the children the language about which she had concerns, she believed he was not present with the children enough to correct the children's language and manners. The mother pointed to those concerns as demonstrating the father's parenting deficiencies; however, the mother admitted that she had stated in her deposition in April 2017 that the father had no parenting deficiencies. The mother's testimony indicated that she believed that the children spent more time with their nanny than with the father.
The mother's testimony indicated that she has close friends who serve as her support system. The mother testified that she does not encourage a relationship between her parents and the children. The testimony indicated that the mother has no relationship with her mother and that she rarely has contact with her father.
The mother called five witnesses to testify on her behalf. The mother's AA sponsor testified that she had known the mother over a year, that she had observed the mother with the children on many occasions, *1234 and that they are "very wonderful together."
Another witness testified that the mother had undergone substance-abuse treatment, that she consistently attends AA meetings, that she volunteers at a substance-abuse treatment facility for women, and that "she's got some very good sobriety. And I think she would make a great mother."
The executive director of the Drug Education Council testified that the council is a nonprofit agency providing prevention, intervention, and recovery-support services in Alabama. That witness testified that she had known the mother for approximately one year and that the mother had been involved in an annual conference and an annual fundraiser luncheon for the Drug Education Council during that year. That witness testified that having a parent who was working the "12 Steps of Recovery" is a "wonderful environment for children to grow up in."
An owner of a yoga studio testified that the mother teaches yoga at her studio. That witness testified that the mother had also volunteered to teach yoga at substance-abuse treatment facilities for women. That witness also testified that she had observed the mother and the children together over the two years since she had met the mother, that they have a good relationship and share a close bond, and that she would trust the mother to care for her own child.
Another witness testified that she knew the mother and the father because the children had previously attended her preschool program. That witness testified the mother had always been attentive and involved with the children. That witness testified that the father's nanny usually picked up the children from school or preschool after the parties' divorce.
The father testified that he intended to marry his fiancée, to whom he had been engaged for approximately two years, the weekend after the trial. The father testified that his fiancée has three children of her own-a 12-year-old girl, a 9-year-old boy, and a 6-year-old boy. The father testified that the children's living situation, which had been the same since before the entry of the September 2015 judgment, would not change once his fiancée and her children move into the house. The father testified that the children will maintain their same, separate bedrooms and that he and his fiancée would add bedrooms onto the house for his fiancée's children.
When asked if the daughter and the son will be "lost" in a home with six children (see note 2, supra), the father testified that he and his fiancée had been dating for over two years, that they have structure when all six of their children are together, and that each child has his or her own unique personality. The father testified that he was aware that either the daughter or his fiancée's youngest child (who were both five or six years old at the time) had taken an inappropriate picture on an iPad. The father testified that he had discovered what had occurred when he heard both children giggling, that he had explained that those actions were inappropriate, and that he had confiscated the electronic devices of those children as punishment.
The father testified that he cooks breakfast each morning for the children. The father testified that he and the nanny alternate transporting the children to school or preschool every other week. The father testified that he usually returns home around 5:00 or 5:30 p.m., but that he arrives home by 4:30 p.m. some days during the week. The father testified that the nanny and his fiancée alternate transporting the children home from school or preschool. The fiancée owns a children's gym, *1235 and the children sometimes go to that gym after school or preschool.
The father testified that he and the mother had utilized the same nanny since January 2015-before the divorce. The father testified that he believed that, when the son begins kindergarten, which was scheduled to occur in August 2017, he will no longer use the nanny's services but that the children might have to have after-school care for approximately one hour, until he arrives home.
The father testified he has not allowed the mother to pick up the children from school or preschool each time that she requests to do so because the children have a schedule that they benefit from following. The father testified that, on occasions when he allowed the mother to pick up the children from school, the mother would never complete the kindergarten homework with the daughter. The father testified that he has the children follow a routine and that they are doing well in school and preschool.
The father testified that, although the children love the mother, and he thinks the mother "loves them to the extent she can love anybody more than herself," the mother is not truly capable of caring for the children. The father testified that the mother had lived in five or six places since the entry of the September 2015 judgment. The father testified that the mother is "fun and she will have a good time with" the children but that he provides structure and stability that the children need.
Standard of Review
"The law is well settled that '[a] parent seeking to modify a custody judgment awarding primary physical custody to the other parent must meet the standard for modification of custody set forth in Ex parte McLendon [, 455 So.2d 863 (Ala. 1984) ].' Adams v. Adams, 21 So.3d 1247, 1252 (Ala. Civ. App. 2009). The custody-modification standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala. 1984), requires that
" 'the noncustodial parent seeking a change of custody must demonstrate (1) "that he or she is a fit custodian"; (2) "that material changes which affect the child's welfare have occurred"; and (3) "that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child." Kunkel v. Kunkel, 547 So.2d 555, 560 (Ala. Civ. App. 1989) (citing, among other cases, Ex parte McLendon, 455 So.2d 863, 865-66 (Ala. 1984) (setting forth three factors a noncustodial parent must demonstrate in order to modify custody) ).'
" McCormick v. Ethridge, 15 So.3d 524, 527 (Ala. Civ. App. 2008). It is not sufficient for a noncustodial parent seeking a modification of custody to show that he or she is a fit custodian. Id. The noncustodial parent must prove all three McLendon factors in order to warrant a modification of custody. Id."
Walker v. Lanier, 180 So.3d 39, 42 (Ala. Civ. App. 2015).
Discussion
The trial court could have found from the evidence that the mother's circumstances had improved since the entry of the September 2015 judgment. Had the trial court been making an initial custody determination, its judgment very well could have been affirmed. See Steed v. Steed, 877 So.2d 602, 604 (Ala. Civ. App. 2003) (citing Nye v. Nye, 785 So.2d 1147 (Ala. Civ. App. 2000) )("When the trial court makes an initial custody determination, neither party is entitled to a presumption in his or her favor, and the 'best *1236 interest of the child' standard will generally apply.").
The question before the trial court, however, was whether the evidence presented by the mother was sufficient to modify the existing physical-custody determination. The father argues that the trial court's custody-modification judgment is not supported by the evidence in the record because the mother did not meet the custody-modification standard set out in Ex parte McLendon, 455 So.2d 863 (Ala. 1984).
In modifying custody, the trial court appears to have relied almost exclusively on the sobriety that the mother had maintained since the entry of the September 2015 judgment and the speculative effect of the father's impending remarriage. The law is well established, however, that rehabilitative measures taken by the noncustodial parent-standing alone-are insufficient to warrant a change in custody. See McLendon, 455 So.2d at 866 ("It is not enough that the parent show that she has remarried, reformed her lifestyle, and improved her financial position.... The parent seeking the custody change must show not only that she is fit, but also that the change of custody 'materially promotes' the child's best interest and welfare."); see also S.L.L. v. L.S., 47 So.3d 1271, 1280 (Ala. Civ. App. 2010) (holding that, "although the mother's rehabilitation and the positive path on which she appears to be is commendable, such rehabilitation alone is an improper basis for regaining custody").
In Gamble v. Segers, 833 So.2d 658 (Ala. Civ. App. 2002), relied upon by the father, this court reversed the trial court's custody modification and explained that the mother's lifestyle reformation was "not enough" to justify a change in custody. Id. at 661. This court held that the child, who was "receiving excellent care from the paternal grandmother," should remain with the paternal grandmother until the mother demonstrated that a change in custody would materially promote the child's best interests and would outweigh the inherent disruptive effects of a custody modification. Id. at 662. The father also relies on J.K.M. v. T.L.M., 212 So.3d 931 (Ala. Civ. App. 2016), which is factually similar to the case before us. In J.K.M., this court found that
"[t]he evidence in the record indicates that both parents love the child. The child is being appropriately cared for in the home of the father, and the mother did not identify any concerns with regard to the father's having sole physical custody of the child. Rather, she presented evidence in support of her contention that, in the last few years, she had improved her own situation by no longer abusing prescription medications. Although we applaud the mother for the improvements in her circumstances, those improvements are not sufficient to warrant a change of custody under the McLendon standard."
Id. at 939. Similarly, here, the trial court specifically found that "both parties are excellent parents, love and nurture their children and are well able to provide for them." The mother in this case provided evidence indicating that she had maintained her sobriety since the entry of the September 2015 judgment and had begun to assist others in their substance-abuse recovery. The mother did not raise any concerns regarding the father's parenting, other than her assertion that the father's use of a nanny and his refusal to allow the mother opportunities to be with the children had had a detrimental impact on the children. In a recent opinion, our supreme court reaffirmed the principle that McLendon"requires more" than showing that the petitioning parent's circumstances had improved and that the petitioning parent *1237 could provide care similar to that of the current custodian. Ex parte D.B., 255 So.3d 755 (Ala. 2017). In D.B., the mother, who had relinquished custody of her child to the child's grandparents six years earlier, petitioned for custody and asserted, among other things, that she had reformed her life and was able to provide a loving and stable home for the child. Id. The mother in that case expressed no concerns related to the grandparents' care of the child but "testified that she believed that she could take care of the child and love her just as well as the grandparents." Id. at 763. Our supreme court held that "there was insufficient evidence to support a conclusion that a change in custody would materially promote the best interest and welfare of the child so that the positive good brought about by the modification would more than offset the inherently disruptive effect of the change in custody." Id. at 760.
As explained above, in its custody-modification judgment and during the postjudgment hearing, the trial court appears to have relied upon the father's impending marriage as a material change in circumstances warranting a modification of custody. The father asserts that his impending marriage and the future addition of three children to his family does not constitute a material change in circumstances. We agree.
The evidence indicated that the father intended to marry and, as a result, would acquire three stepchildren, but this change had not occurred at the time the mother petitioned for a custody modification or at the time the trial court entered its custody-modification judgment. Furthermore, the record contains no evidence of how the purported material change-the father's marrying and receiving additional children into his home (which had not yet occurred)-has had any impact on the children.
Even if the evidence somehow supported a finding that a material change in circumstances had occurred, the mother was required to prove that the positive good brought about by the change in custody would more than offset the disruptive effect of uprooting the children. Kunkel v. Kunkel, 547 So.2d 555, 560 (Ala. Civ. App. 1989) ; McLendon, 455 So.2d at 866. The record contains no evidence to support a conclusion that transferring physical custody of the children to the mother would "materially promote" the children's best interests.
The trial court found that the father is dependent upon the use of a nanny while the mother would be able to devote more time to the children. The evidence indicated that the nanny, whose services had been utilized since before the entry of the September 2015 judgment, took the children to school or preschool every other week and that the nanny picked up the children from school or preschool and cared for them for approximately one hour until the father returned home from work. The father testified that, once the children began school full-time in August 2017, he would no longer utilize the nanny's services.
The trial court also specifically found: "It is impossible for this Court to see how the two minor children would not receive more time and attention from the [mother] which would materially promote the best interests of the children." The record, however, does not show that the mother would be able to spend more time with the children, who will be in school all day during the school year, than the father is already spending with them.
The mother testified: "I would be able to spend all the time necessary with [the children]. I would be the one to fix their *1238 breakfast, get them dressed for school, take them to school, volunteer at the school, pick them up from school, transport them to and from activities." The mother also testified, however, that she attends AA meetings at least three times per week, that she "absolutely" needs to attend those meetings, and that she had a "roomful of people who would ... babysit" the children so that she could attend those meetings.
The father testified that he cooks the children breakfast every morning, that he cares for the children after he returns home from work, and that he is very involved in their school and extracurricular activities. The evidence does not indicate that, even if the mother would be able to spend more time with the children than the father, any additional time spent with the mother would materially promote the children's best interests. See T.C.T.B.M. v. B.T., 65 So.3d 411, 417 (Ala. Civ. App. 2010) (holding that the positive good brought about by the ability of the father in that case to spend additional time with the child was not "sufficient to overcome the inherently disruptive effect that a change in custody would have on a ... child who had lived primarily with the mother since his birth").
In B.S.L. v. S.E., 875 So.2d 1215 (Ala. Civ. App. 2003), relied upon by the father, this court reiterated that
"[t]he evidence presented by the parent seeking to modify custody ' "must be so substantial as to show an obvious and overwhelming necessity for a change." ' B.S.L.[ v. S.E.], 826 So.2d [890] at 893 [ (Ala. Civ. App. 2002) ] (quoting Vick v. Vick, 688 So.2d 852, 855 (Ala. Civ. App. 1997) ). 'When there are "equal advantages and disadvantages to living with either the mother or the [father]," then moving the child cannot be said to materially promote the welfare of the child.' Trusty v. Newton, 678 So.2d 1173, 1175 (Ala. Civ. App. 1996) (quoting Ex parte Couch, 521 So.2d 987, 989 (Ala. 1988) )."
875 So.2d at 1224.
The children had remained in the father's physical custody for at least two years, had remained in the same house since birth, and, assuming the transition involving a new stepmother and stepsiblings occurs, will maintain their own separate bedrooms. The mother, in contrast, had lived in five or six different places since the entry of the September 2015 judgment. The mother testified that she and her aunt would soon move into a three-bedroom/three-bathroom house and that they intend to add on three additional bedrooms and bathrooms. The evidence indicates that a change in custody would result in the children's being removed from the home they have lived in since birth and living in a rental home until they move to the mother's new house after it is remodeled. As this court has often explained, "[f]requent disruptions are to a be condemned." Wood v. Wood, 333 So.2d 826, 828 (Ala. Civ. App. 1976).
The evidence in this case does not demonstrate that a material change in circumstances had occurred, or that a transfer of custody to the mother would materially promote the children's best interests and more than offset the disruptive effect of the change in custody. Accordingly, we reverse the judgment granting the mother's petition to modify custody. See D.B., supra. Because we are reversing the custody-modification determination, the provisions of the custody-modification judgment related to child support and visitation are also due to be reversed; therefore, we pretermit discussion of the father's arguments as to those issues.
REVERSED.
Thompson, P.J., and Pittman, Thomas, and Donaldson, JJ., concur.
Moore, J., recuses himself.

Although the September 2015 judgment uses the language "primary physical custody," we construe that judgment as vesting the father with "sole physical custody," as defined in § 30-3-151(5), Ala. Code 1975. See Reeves v. Fancher, 210 So.3d 595, 597 n. 1 (Ala. Civ. App. 2016) (explaining that the term "primary physical custody" is not one of the five types of custody defined in § 30-3-151 ).

In addition to C.J. and W.J. with the mother, the father has a third child from a previous relationship.

We construe the custody-modification judgment as vesting the mother with "sole physical custody." See note 1, supra.