On Application for Rehearing

MOORE, Judge.
This court’s opinion of July 17, 2015, is withdrawn, and the following is substituted therefor.
K.U. (“the maternal grandmother”) appeals from a judgment of the Montgomery Juvenile Court (“the juvenile' court”) awarding custody of S.C. (“the child”) to J.C. (“the father”) and R.C. (“the stepmother”). We reverse and remand.

*268
Procedural History

On January 29, 2008, the juvenile court entered a consent judgment (“the 2008 Montgomery judgment”) awarding the maternal grandmother and T.W. (“the paternal grandmother”) joint legal and physical custody of the child, whose date of birth is December 19, 2005. On July 1, 2008, the Autauga Juvenile Court entered a judgment (“the 2008 Autauga judgment”) in a dependency case awarding the maternal grandmother and the paternal grandmother joint legal and physical custody of F.C., the child’s sister, whose date of birth is November 22, 2004. On February 15, 2013, the father and the stepmother filed, in the juvenile court, a petition to modify the custody of the child and F.C. On March 28, 2013, the maternal grandmother filed an answer to the petition. Subsequently, the juvenile court transferred the petition to modify the physical custody of F.C. to the Autauga Juvenile Court. In April 2014, the father consented to a judgment being entered by the Autauga Juvenile Court pursuant to which the custody of F.C. was awarded to the maternal grandmother, and the father’s custody-modification petition as to'F.C. was dismissed. After a trial, the juvenile court entered a judgment awarding custody of the child to the father and the stepmother. On November 12, 2014, the maternal grandmother filed her notice of appeal to this court.

Discussion

On appeal, the maternal, grandmother primarily argues that the juvenile court did not receive sufficiént evidence to sustain its judgment.[1] • .
‘“Where a parent has transferred to another [whether it be a nonparent or the other parent], the custody of his [or her] infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he [or she] ean show that a change of the custody will materially promote, his [or her] child’s welfare.’ ”
Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947) (quoting Stringfellow v. Somerville, 95 Va. 701, 29 S.E. 685, 687 (1898)). To meet that burden, the party petitioning for modification must prove to the satisfaction of the trial court (1) that the circumstances upon which the' original judgment was based have changed, (2) that he or she is fit to act as a custodian for the child, and (3) that ‘“the positive good brought about by the modification ... more than offset[s] the inherently disruptive effect caused by uprooting the child.’ ” Ex parte McLendon, 455 So.2d 863, 865 (Ala.1984) (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)). On appeal, this court presumes the correctness of- a judgment based upon evidence presented ore tenus. Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).
“ ‘[W]e will not reverse [the judgment] unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown. To *269 substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow.’ ”
Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)). However, this court reviews the' interpretation and application of the McLendon standard, which involve pure questions of law, de novo. Gallant v. Gallant, 184 So.3d 387, 401 (Ala.Civ.App.2014).
I. Material Change of Circumstances
The maternal grandmother first argues that the father did not present any evidence of a material change in circumstances. ’
“The doctrine of res judicata provides that a final judgment entered by a court of competent jurisdiction' binds the parties from relitigating the issues decided therein. See Hughes v. Martin, 533 So.2d 188 (Ala.1988). Applied strictly, that doctrine would prevent repeated .litigation over the custody of a child; however, as early as 1858, our supreme court recognized that, because of the shifting nature of the needs of a growing child, a court of equity should be allowed to redetermine custody in appropriate cases. See Cornelius v. Cornelius, 31 Ala. 479 (1858). In keeping with the rationale behind the doctrine of res judi-cata, the supreme court decided that, in order to prevent ‘oft-repeated, harassing litigation over the custody of infants,’ a final child-custody determination, like any other judgment, could not be reopened for reconsideration of the correctness of the judgment. Sparkman v. Sparkman, 217 Ala. 41, 43, 114 So. 580, 581 (1927). It further held, however, that, if a party could satisfactorily prove that circumstances had changed in a significant way since the entry of the earlier judgment, the doctrine of res judicata would not preclude a new determination of child custody based on those changed circumstances. See Pearce v. Pearce, 136 Ala. 188, 190, 33 So. 883, 884 (1903). Hence, the law became that a prior custody judgment could be modified based only on a .material change of circumstances. See Wren v. Stutts, 258 Ala. 421, 422, 63 So.2d 370, 371 (1953).”
Gallant v. Gallant, 184 So.3d at 392-93.
The evidence in the record shows that, at the time of the entry of the 2008 Montgomery judgment, the father was 22 years old, was unemployed, was undergoing a divorce from the mother of the child, and was living with the paternal grandmother,. The father agreed, at that time, that he was unable independently to support the child and F;C., so he consented to transfer their custody to his mother and the maternal grandmother, jointly, for the best interests of those children. The parties contemplated -that the custody arrangement would be‘temporary until either the father or the mother stabilized and “got back on [his or her] feet” sufficiently to care for the child and F.C.
Two months after the juvenile court entered the 2008 Montgomery judgment, the child and F.C., who were then two and three years old, respectively, moved into the home of the maternal grandmother, which is located in Prattville, with the paternal grandmother’s agreement. Only days later, the father moved from the paternal grandmother’s home to Eatonton, Georgia, to find work. Thereafter, the maternal grandmother exercised de facto custody of the children, with , the father regularly communicating with the children over the telephone and visiting with the children every other weekend, in his home or in the paternal grandmother’s home, apparently in accordance with the terms of *270 the 2008 Montgomery judgment and the 2008 Autauga judgment.
In 2009, after the father had obtained steady employment and had begun a relationship with' the stepmother in Georgia, the father began soliciting the maternal grandmother and the paternal grandmother to regain custody of the child and F.C. The father testified that, at that point, he had felt that it would be beneficial for the child and F.C. to be reunited with him. The paternal grandmother essentially directed the father to the maternal grandmother, who expressed concerns about the father’s uncertain marital and housing circumstances. Partially to satisfy the maternal grandmother, the father married the stepmother in 2010, and they had a son, A.C., that same year. The maternal grandmother did not agree to a change of custody, however, stating only that it would improve her outlook on the matter if the father moved back to Alabama. In March 2011, the father, the stepmother, and their child moved to Montgomery,' where they lived for a few months, until they moved to a suitable home in Prattville only a few miles from, and in the same school district as, the maternal grandmother’s home.
Despite the father’s having moved from Georgia to Montgomery and then to Pratt-ville, the maternal grandmother retained custody'of the child and F.C. The record is not entirely clear, but it appears that the father continued to exercise his scheduled visitation, although it seems he became more involved in the daily lives of the child and F.C. due to his new proximity, even attending the same church they attended. Through visitation, the child developed a strong relationship with the stepmother, who, the paternal grandmother testified, acted as'a surrogate mother for the child due to the general lack of involvement of the child’s birth mother. The child also enjoyed her role as a big sister to her half brother. After repeatedly broaching the subject of a change of custody with the maternal grandmother without success, the father and the stepmother petitioned the juvenile court to modify the 2008 Montgomery judgment to award them custody of the child.
A material change of circumstances occurs when the state of facts upon which a court based its prior custody determination have changed. See Ex parte Blackstock, 47 So.3d 801, 813 (Ala.2009). In this case, the juvenile court based its 2008 Montgomery judgment on the agreement of the parties that the father was unable to properly care for the child due to his unemployment, his lack of independent housing, .and his overall instability. The evidence demonstrates, without dispute, that, by the time he filed the custody-modification petition, the father’s former circumstances rendering him unable to properly care .for the child and F.C. had changed. He had remarried, had moved to Pratt-ville, had secured steady and profitable employment, and had obtained adequate housing. All of the problems that had prevented the father from exercising custody of the child and F.C. in 2008 had been resolved by 2014.
The maternal grandmother points out that, at the time of the trial, nothing in the child’s custodial arrangement had changed since the entry of the 2008 Montgomery judgment — the child had been residing in the same home, with the same persons, and under the same conditions for the last seven years. However, for res judicata purposes, the key inquiry concerns whether the circumstances upon which the judgment was based have changed, not whether the postjudgment living conditions of the child have changed. The circumstances' clearly had materially changed since the juvenile court entered the 2008 *271 Montgomery judgment such that the doctrine of res judicata did not prohibit the juvenile court from considering whether custody should be modified.
II. The McLendon Standard
A. Fitness
The change in the father’s circumstances undisputedly rendered him fit to exercise custody of the child. At trial, the maternal grandmother basically conceded that the father was fit to raise the child. In its final judgment, the juvenile court expressly found that the father and the stepmother were fit and proper persons to assume custody of the child. 'Sufficient evidence supports that finding in regard to both the father and the stepmother.' However, the juvenile court appears to have overemphasized the significance of that factual finding.
In its "final judgment, the juvenile court noted that the parties had agreed that the maternal grandmother would exercise custody only until the father was able to raise the child himself. The juvenile court expressly criticized the maternal grandmother for being unwilling to return the child to the father “for unjustifiable reasons” after the father had proven to her that his situation had stabilized. The juvenile court also noted in its final judgment that the maternal grandmother had failed to produce evidence to .prove that the child should remain permanently in her custody. That reasoning does not accord, with the McLendon standard..
In Ex parte McLendon, a divorce judgment incorporated an agreement pursuant to which the parents consented to give custody of their child to the paternal grandparents. The mother later petitioned the same court that had entered the consent judgment to modify the child-custody provisions of the judgment. The mother asserted that she should regain custody of the child because she had remarried and could provide the child a stable and wholesome home with her new husband and hew child. "The supreme court held, however, that to obtain a custody modification “[i]t is not enough that the parent show that [he or] she has remarried, reformed [his or] her lifestyle, and improved [his or] her financial position.” 455 So.2d at 866. The supreme court determined that, because the paternal grandparents had acted as custodians of the child based on an agreement that had been incorporated into a judgment; the mother “must show not only that she is fit, but also that a change óf-custody ‘materially promotes’ the child’s best interest and welfare.” Id.
According to the supreme court’s holding in Ex parte McLendon, a parent cannot regain custody of a child from a grandparent who received custody of that child pursuant to a consent judgment merely by proving that he or she has become fit to parent the child. Furthermore, Ex parte McLendon plainly provides that, even if the petitioning parent proves his or her fitness, the burden still remains on the parent to prove that the change of custody will “materially promote” the welfare of the child. Upon proof of parental fitness, the burden does not shift to the grandparent to present “justifiable reasons” why the child should remain Tyifh the grandparent. In fact, the law “presumes that stability is inherently more beneficial to a child than disruption.” Ex parte Cleghorn, 993 So.2d 462, 468 (Ala.2008).
Neither this court nor our supreme court has ever discarded or altered the McLendon analysis based solely on the fact that the parties may have agreed that custody would change if the parent rehabilitated himself or herself. To the contrary, this court has consistently held that any express clause in a divorce judgment *272 that purports to order a change of custody based on the occurrence of some future condition is void. See Hovater v. Hovater, 577 So.2d 461 (Ala.Civ.App.1990). This court does not enforce a “custodial reversionary clause” precisely because “it is premised on a mere speculation of what the best interests of the children may be at a future date.” 577 So.2d at 463. Thus, as this court, held in Hovater, a trial court deciding whether to modify custody may base its decision only on the applicable legal standard, in this case the McLendon standard, without regard for the terms of any custodial reversionary agreement. In this case, the fact that the maternal grandmother may have failed, to honor the original agreement with the father should not have had any bearing on the juvenile court’s inquiry into whether the custody of the child should be modified.
B. Stability of Current Custody Arrangement
The testimony at trial established that the maternal grandmother had been devoted to providing the child a safe, secure, stable, loving, and beneficial home over the seven previous years. The father agreed that the maternal grandmother had consistently provided good care to the child. The paternal ‘grandmother testified that the child and F.C. had bonded and that they had a great relationship with the m'aternal grandmother. The father testified' that the maternal grandmother communicated with him about, and was involved in, the educational process' for the child and F.C., and that she had provided a tutor to help them with their homework. The maternal grandmother also attended to the medical needs of the child and F.C. and covered them on her health insurance. The- father testified that the maternal grandmother had never interfered with his biweekly visitation with the child and F.C. The maternal grandmother had also arranged for the child to participate in soccer and church choir.
The McLendon standard creates a “ ‘rule of repose’ ” by “ ‘allowing the child ... the valuable benefit of stability and the right to put down into its environment those roots necessary for the child’s healthy growth into adolescence and adulthood.’ ” Ex parte McLendon, 455 So.2d at 865 (quoting Wood v. Wood, 333 So.2d at 828). The McLendon standard is designed “to minimize disruptive changes of custody because this, Court presumes that stability is inherently more beneficial to a. child than disruption.” Ex parte Cleghorn, 993 So.2d at 468. When implementing the McLendon .standard, a trial court should allow a transfer of custody “only after a sifting inquiry to assure that the stability and other interests of -the child ... have been properly considered.” Gallant v. Gallant, 184 So.3d at 399. In making its determination, the juvenile court had to consider that the child had been residing comfortably in a stable and beneficial custodial arrangement since 2008, from the time she was a toddler and through her primary-school years.
C. Disruptive Effects of Change of Custody
The juvenile court found that the disruption to the child from changing custody would be “slight.” The evidence ‘shows that the father has steadily communicated with and has regularly visited with the child throughout her life and.that he has consistently, maintained a paternal relationship with the child. Furthermore, by meeting the conditions set forth by the maternal grandmother, the father has effectively minimized a great deal of the disruption a change of custody .would have otherwise caused. The child would. not have to change schools, church, or extra *273 curricular activities in order to reside with the father. In addition, at the time of the trial, the parties had been sharing alternating weekly custodial periods throughout the summer of 2014 based on an April 13, 2014, pendente lite order, so the child had become accustomed to her father’s home and had developed a good personal relationship with the stepmother and her half brother.[2]
On the other hand, the father testified that the child was “very, very close” to her sister. In her report to the juvenile court,[3] the guardian ad litem appointed for the child stated:
“The two girls are extremely close as they have never been without one another. The two girls are never out of one another’s sight and appear to watch out for one another as sisters do .... [The child] and [F.C.] .are each other’s best friend and the only constant one another have had since birth. Although the girls have been separated for brief periods of time, they have never been without one another for more than a few days.”
The paternal grandmother, the father, and the stepmother all testified that they would be opposed to splitting custody of the child and F.C. The maternal grandmother testified that the child and F.C. do hot function well separately. The father testified that, ⅛ the parallel modification proceeding in the Autauga Juvenile Court, he had consented in April 2014 to leaving custody of F.C. with the maternal grarid-mother.[4] The father.-testified that, if he gained custody of the child- through the juvenile court, he would petition the Au-tauga Juvenile Court to modify custody of F.C. based on that change of circumstances, but he would not do so if the juvenile court denied his custody-modification petition. Given the unanimous opinion of those most.closely attuned to the needs of the child, it is apparent from the record that changing custody of the child would disrupt the nature of the profound relationship between the child and her sister, even though they would still see each other occasionally at school, after school when in the care of the maternal grandmother, at church, and during shared visitation periods.
This court has sometimes stated that siblings should be separated only for the most compelling reasons. See Alverson v. Alverson, 28 So.3d 784 (Ala.Civ.App.2009). In A.B. v. J.B., 40 So.3d 723, 729 (Ala.Civ.App.2009), we clarified that “our caselaw more accurately holds that siblings may be separated if the trial court concludes, based on sufficient evidence in the record, that the separation yvill serve the best interests of the children at issue.” We intended that, in deciding whether siblings should be separated, the trial court should not focus solely on the biological relationship between the children, but on the actual interpersonal relationship between the children and how that relationship will be affected by their separation. See Alver *274 son, 28 So.3d at 790 and 793 (Moore, J., concurring in part and concurring in the result in part). We did not mean that, in reaching that determination, the trial court should disregard the relationship between the 'children and inquire into the best interests of each child in isolation. Only by doing so could the juvenile court in this case have concluded that a change in custody would cause only a “slight” disruption to the child.
D. Positive Benefit
1. The Parental Presumption
At the outset of the trial, the juvenile court stated: “My preference all things being equal would be to have the children with their father and not their grandmother.” After hearing “opening statements” from counsel and the guardian ad litem, the juvenile court also stated:
“I think without hearing from the parties and without hearing the testimony and the documentary evidence, I think that I might be inclined to award custody to the father based upon what Fm hearing. Now, I hadn’t heard the evidence and hearing the evidence may sway me to go a different way. But based upon what Fm hearing now, I just don’t see awarding custody right now at this juncture to the grandmother, I don’t.”
In the final judgment, the juvenile court found that it would serve the best interest of the child to be “reunified” with 'the father because, among other things, the overwhelming evidence showed that he and the stepmother are “fit and proper persons” to care for the child.
As counsel for the maternal grandmother correctly argued to the juvenile court, a natural father who has voluntarily relinquished custody of a child to a nonparent thereby forfeits his prima facie right to custody of the child, and, under such circumstances, a court cannot indulge any preference in favor of the father based on his paternity of the child in a subsequent custody-modification proceeding. Ex parte McLendon, 456 So.2d at 865. The witnesses called by the father all testified that, generally, a child would be better off being raised “normally” in a traditional family setting, rather than having to explain why he or she is being raised by a grandparent, which the paternal grandmother testified could subject the child to a social stigma, which, she said, she had observed at a private school in Montgomery. That testimony, to the extent it fails to demonstrate how the child at issue was actually being adversely treated due to her living arrangements, amounts to nothing more than an attempt to afford the natural father, in a contest with the maternal grandmother, the benefit of a presumption that he should have custody of the child. Furthermore, the paternal grandmother testified that a child could also be similarly socially stigmatized by being raised by a stepparent, so the above-referenced testimony failed to prove that the child would avoid this alleged harm by changing custody to the father and the stepmother.
In short, a noncustodial parent cannot meet the McLendon standard, which requires affirmative proof of the positive good to the child, by asserting that all children are hypothetically better off in parental custody. A noncustodial parent must present more concrete evidence demonstrating the actual, not presumed, benefit to the child. See generally Gallant v. Gallant, 184 So.3d at 401.
2. Lack of Cooperation
The stepmother testified that the maternal grandmother did not always share with her and the father information aboút the child’s school activities. The stepmother also recounted an occasion when the ma *275 ternal grandmother had failed to pay a fee the stepmother had offered to pay, resulting in the child’s missing her second-grade field trip. The maternal grandmother acknowledged that error and testified that the child had ended up spending the day with her instead of her classmates. The stepmother also noted that, when she had picked up the child from the home of the maternal grandmother, the child sometimes had displayed sadness, which, the stepmother said, she attributed to possible manipulation by the maternal grandmother. Furthermore, the maternal grandmother had asked the father and the stepmother on at least one occasion to allow the child to forgo a weekend of their scheduled visitation; had failed to remind the child to telephone the stepmother on Mother’s Day; and had-failed to have the child contact her half brother on his birthday, even though the child had later attended his birthday party. The stepmother testified that she felt the maternal grandmother did not want the stepmother to “be in the situation” and that the relationship between her and the maternal grandmother had become more stressful since the filing of the custody-modification petition. In its final judgment, the juvenile court determined that the maternal grandmother was not being supportive and encouraging of the father’s claim to custody.
This court has routinely held that a noncustodial parent does not satisfy, the McLendon burden by showing dissatisfaction with, or disputes over, thp operation of an existing .custody arrangement. See, e.g., Watters v. Watters, 918 So.2d 913, 917 (Ala.Civ.App.2005) (party’s frustration with custody arrangement did not afford grounds to modify physical custody of child); Lami v. Lami, 564 So.2d 969, 970 (Ala.Civ.App.1989) (“disputes over visitation are not alone sufficient to necessitate a change in custody”).[5] Nothing in the record would substantiate any finding by the juvenile court that the maternal grandmother was intentionally attempting to alienate the child from the father and the stepmother, which, if substantiated, would place the case in a different posture. See K.T.D. v. K.W.P., 119 So.3d 418, 428 (Ala.Civ.App.2012) (affirming custody modification when the mother, the custodial parent, “believed that she did not have to co-parent the child with the father ... and ... that the father [was] simply a visitor of the child with no additional rights” and used her custodial authority to unduly interfere with the child’s relationship with the father).
3. Custodial Preferences
The father testified that the maternal grandmother did not regularly take the child and F.C. to a pediatrician and- that the maternal grandmother had initially opposed testing the child and F.C. for attention deficit/hyperactive disorder (“ADHD”), having agreed to such testing only when it had been recommended by the guardian ad litem. However, the father testified that the maternal grandmother had been taking the child and F.C. to a general practitioner in Prattville and that he, the father, had initially agreed with her plan to avoid medicating the child and F.C. to .treat any of their ADHD symptoms. . The maternal, grandmother explained that she did not like driving into Montgomery, which is where she would have to- go for the child and F.C. to see a *276 pediatrician. The guardian ad litem opined that, by choosing to take the child to a local general practitioner, the maternal grandmother was placing her own convenience ahead of the interest of the child; however, she acknowledged in her report that the child was healthy and had no unmet medical needs. Additionally, the father testified that, after testing revealed a need for a pediatrician, the maternal grandmother had actually helped locate a suitable doctor.
The father noted that the child was not on pace with her reading. The stepmother testified that, as a third grader, the child was reading at a 2.8 level, meaning that “she’s in her second year, eight[h] month of reading.” Both the father and the stepmother testified that they directly supervise the child’s reading. The maternal grandmother testified that she reads with the child but that she also had arranged for a tutor to assist with the education of the child. The stepmother testified that the maternal grandmother had met the child’s needs and that, although the child was “a little behind”'in reading, it was “not enough to repeat a year or need special help.” The maternal grandmother testified that the stepmother had stated that she, the stepmother, did not specifically know how to deal with a slow learner.
The stepmother testified that she believed the child did not have enough of a social life, an opinion the guardian ad litem shared. The maternal grandmother disagreed, stating that the child has friends from soccer, Bible study, and church. The stepmother testified that the child had not spent the night with other children as the stepmother had at the child’s age. The maternal grandmother testified that the child had attended parties büt that the child had never requested a “sleepover.” The father testified that the child partakes in a more varied social life when she is in his custody because he and the stepmother engage in more outdoor activities and because they have friends over to their house who have children the same age as the child.
The guardian ad litem criticized the maternal grandmother for having allowed the child to visit unsupervised with the mother.[6] The evidence was undisputed that the mother could freely visit with the child without supervision and that the mother did so once or twice a month. However, the guardian ad litem reported that the mother was permitted only supervised visitation with F.C. On one occasion, the maternal grandmother had allowed the mother to take the child and F.C. for ice cream unaccompanied. Although it appears that the maternal grandmother violated a court order with regard to F.C. on that occasion, this case concerns the child, and no evidence was presented indicating that the child had been endangered during that visitation. The maternal grandmother testified that she believed it was best to build trust with the mother and that she encouraged the relationship between the child and the mother. The father and the stepmother did not explain how they would regulate the relationship and visitation be-' tween the child and the mother, if at all.
*277 The foregoing critiques of the maternal grandmother’s parenting style may prove that she is an imperfect custodian in the eyes of the father, the stepmother, and the guardian ad litem. That same evidence may also show that the child would be raised differently by the father and the stepmother; however, in order to meet the McLendon standard, a noncustodial parent must prove more than his or her disagree-' ment with the particular methods selected by a custodian for meeting the medical, educational, social, and other needs of a child. See Bishop v. Knight, 949 So.2d 160 (Ala.Civ.App.2006) (reversing judgment modifying custody based on parental disagreement over disciplinary measures). The noncustodial parent must show that his or her plan of care would improve the life of the child. See Jones v. McCoy, 150 So.3d 1074 (Ala.Civ.App.2013) (trial court could reasonably conclude that mother was stifling 15-year-old-child’s ability to mature into independent adult -by preventing the child from playing football and engaging in social activities commensurate with his age and that his athletic and social potential would be maximized by change of custody to father who explained detailed plan he had implemented that improved child’s life skills and self-reliance).
4. Emotional Needs
The stepmother testified that, overall, the child was doing well in the maternal grandmother’s care and that she appeared happy. In her report, the guardian ad litem recorded the father and the stepmother as describing the child as “happy, healthy, [and] energetic.” Nevertheless, at trial, the father testified that the child had shown signs of depression, sometimes exhibiting “a complete meltdown” and crying inappropriately. He opined that such episodes had decreased “the more we have had her.” The stepmother testified that the child “tends to be a little emotional at times,” which she attributed mainly to the “lovey dovey” nature of the child.» The guardian ad litem testified that, on one occasion, the child had barricaded herself in her room at the maternal grandmother’s home, which the guardian ad litem described as an isolated abnormal behavioral outburst for the child. The stepmother testified that the child would sometimes “clam up in her room” for “alone time” when she was staying with the father and the stepmother.
No evidence suggests that the child has been diagnosed with any emotional or psychological problem, that she exhibits those problems more frequently or more intensely in the custody of the maternal grandmother than in the custody of the father and the stepmother, or that the father and the stepmother better recognize, understand, and react to those problems than the maternal grandmother can or would. At trial, the maternal, grandmother was not even questioned about the child’s emotional state. The father and the stepmother failed to present any evidence indicating that the emotional welfare of the child would be improved by being in their care.
5. Material Promotion
To affirm the judgment'modifying the physical custody of the child, this court must discern the evidence from which the juvenile court could have reasonably inferred that the interests of the child would be “materially promoted” by a change in custody. Most of the evidence contained in the record relates to criteria deemed legally insufficient to warrant a change in custody. In their brief on application for rehearing, the father and the stepmother cite the evidence indicating that the maternal grandmother, although a “wonderful grandmother,” is not the child’s parent. They argue that they “fill all the roles where the maternal grandmother falls short.” - However, in their rehearing brief *278 and at oral argument, the father and the stepmother were unable to identify the precise evidence proving that, upon a change in custody, the child would receive a “substantial” benefit, as the juvenile court found in its judgment.
The’ facts of this case closely mirror those in Ex parte McLendon, supra. In Ex parte McLendon, the mother surrendered custody of her child to the paternal grandparents in a consent judgment. The mother then moved out of state, thereafter visiting with the child. After the paternal grandparents had provided quality care to the child for several years, the mother sought to regain custody of the child. She proved that she had remarried to a man who supported her petition for custody of the child and who could provide financially for the child. She established that she had stabilized so that she was able to provide a wholesome environment for the child, and she agreed to allow the paternal grandparents liberal visitation with the child. The supreme court examined the record and determined that both parties were equally capable of caring for the child and that both would provide the child a nurturing, loving home. The supreme court held:
“The most that the mother has shown is that her circumstances have improved, and she is now able to provide for the child in the same manner in which the grandparents have been providing for her. She has failed to show that changing the custody materially promotes the welfare and best interest of the child.”
455 So.2d at 866. We cannot distinguish any material difference between the facts of this case and those in Ex parte McLendon, in which the supreme court concluded that the custody-modification standard had not been met.
E. Weighing of the Benefits Against Disruption
Whether the benefits of changing physical custody of the child from the maternal grandmother to the father more than offsets the inherently disruptive effect resulting from the change in custody was a question of fact for the juvenile court. Jones v. McCoy, 150 So.3d at 1084. On rehearing, the father and the stepmother argue that, because the juvenile court expressly mentioned the McLendon standard and found that the positive good resulting from the change in custody outweighed the disruptive effects caused by the uprooting of the child, this court must affirm its judgment under the ore tenus standard of review. That argument overlooks the role of this court to assure that sufficient evidence supports the determination of the juvenile court and that the juvenile court did not exceed its discretion when making its decision.
It is apparent that, from its statements during the trial and the wording of its judgment, the juvenile court erroneously presumed that the child should be reunited with the father once he proved his fitness. However, the McLendon standard required the juvenile court to presume that stability would be more beneficial to the child than disruption until the father and the stepmother demonstrated that the positive good from a change of custody would outweigh the disruptive effects from the change. See Ex parte Cleghorn, supra. The evidence in the record shows that the modification would effectively separate the child from F.C. — her sister, best friend, and lifelong companion — which, as proved by the uniform opinion of every witness and the guardian ad litem, would not be in the best interests of the child. Based on this record, the juvenile court could not have determined that the loss would be ameliorated by other factors because the evidence failed to show any real advantage the child would gain *279 from a transfer of custody to the father, much less any benefit so significant as to offset the detrimental change in the nature of the child’s relationship with F.C.
In Ex parte Couch, 521 So.2d 987, 989 (Ala.1988), the supreme court explained that, in Ex parte McLendon, it had determined that the evidence did not show that the interests of the child would be materially promoted “[b]ecause there were equal advantages and disadvantages to living with either the mother or the grandparents.” In this case, the evidence in the record shows, at best, equal advantages and disadvantages to the child’s living with either the maternal grandmother or the father and the stepmother. Under the reasoning of Ex parte McLendon, “all things being equal,” as the juvenile court said, only one valid legal conclusion could be reached — that the custody of the child should not be modified.

Conclusion

Based on the foregoing, we reverse the judgment of the juvenile court modifying custody of the child, and we remand the cause for the entry of a judgment consistent with this opinion.[7]
APPLICATION GRANTED; ..OPINION OF JULY 17, 2015, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, THOMAS,[8] and DONALDSON, JJ., concur.

. The father and the stepmother argue that the maternal ■ grandmother did not preserve her arguments or make sufficient legal argu- . ments in her brief to this court in accordance with Rule 28, Ala. R.App. P. We have reviewed the record and the maternal grandmother's' brief and conclude that neither of the father and the stepmother’s assertions are meritorious. We specifically note that the juvenile court made specific findings of fact; thus, the maternal grandmother was not required to file a postjudgment motion to preserve her argument regarding the sufficiency of the evidence. See Rule 52(b), Ala. R. Civ. P.

. The maternal grandmother does not argue that the juvenile court .could not consider any changes wrought by the, pendente lite order when deciding whether the 2008 Montgomery judgment should be modified, so we do not consider that point. See McCulloch v. Campbell, 60 So.3d 909, 919 (Ala.Civ.App.2010).

. Although the report was not submitted into evidence, the juvenile court expressly stated that it had relied on the report in its judgment, without objection from either party. Compare Ex parte R.D.N., 918 So.2d 100, 103-04 (Ala.2005) (holding that trial court cannot consider ex parte guardian ad litem report, which violates due process, over timely objection of one of the litigants).

. The father testified that the guardian ad litem appointed for, F.C. in the Autauga Juvenile Court proceeding "strong-armed” him into agreeing to dismiss his custody-modification petition relating to F.C.

. Moreover, the maternal grandmother has not appealed that portion of the judgment awarding the father and the stepmother joint legal custody of the child, which should enable them to obtain their own access to the child’s school schedule. See Ala.Code 1975, § 30-3-151(2) (defining “joint legal custody” to include the right to direct the education of the child).

. In her report, the guardian ad litem also criticized the matérnal grandmother for allowing the child to refer to her as "Mama.” The maternal grandmother denied that she had requested that the,child refer to her by that name. The evidence is undisputed that the child is aware of the identity of her biological mother. The father and the stepmother have failed to show how the child's referring to the maternal grandmother as "Mama” indicates that custody of the child should be changed, especially considering the testimony of the paternal grandmother and the stepmother- portraying the stepmother as the child’s surrogate mother.

. . Because we have reversed the judgment on the ground that the father and the stepmother did not satisfy the McLendon standard, we pretermit any discussion of the evidentiary argument raised by the maternal grandmother.