Rel: September 5, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

_____

### CL-2025-0231

_____

### E.K.C.

### v.

### D.L.G.

### Appeal from Cullman Juvenile Court
### (CS-19-900212.03)

MOORE, Presiding Judge.

E.K.C. ("the mother") appeals from a judgment entered by the Cullman Juvenile Court ("the juvenile court") modifying its 2019 judgment relating to the custody of her two children with D.L.G. ("the father"). For the following reasons, we reverse the judgment and remand the case to the juvenile court.

<u>Procedural Background</u>

The mother and the father are the biological parents of two children, who were born in 2018 and 2019, respectively. In 2019, the juvenile court entered a judgment incorporating an agreement of the parties relating to the custody of the children ("the 2019 judgment"). The 2019 judgment, among other things, awarded the parties joint legal custody of the children, with the mother receiving final decision-making authority for education and health-care matters; awarded the mother sole physical custody of the children, subject to certain visitation rights awarded to the father; and ordered the father to pay $400 per month for child support. The judgment further provided that the father could visit with the children three evenings a week from 5:00 p.m. to 9:00 p.m. and once a week from 9:00 a.m. until 7:00 p.m., with overnight visits being allowed only after the father obtained his own home. In 2024, the father filed a petition to modify the 2019 judgment.[1]

---

[1]In 2023, the mother filed a petition to modify the visitation and child-support provisions of the 2019 judgment. The case commenced by that petition was consolidated with the underlying case, and the juvenile court denied the mother's modification petition. The mother appealed, and this court dismissed the appeal by order because the judgment denying her petition was not a final judgment. <u>E.K.C. v. D.L.G.</u> (No. CL-2025-0230, Aug. 26, 2025).

On March 28, 2025, the juvenile court entered a judgment granting the father's modification petition ("the 2025 judgment"). The 2025 judgment, among other things, awarded the parties joint legal custody of the children, with the father receiving final decision-making authority over civic, cultural, athletic, and health-care matters and the mother receiving the same authority over religious and academic matters, and awarded the parties joint physical custody of the children to be exercised on a rotating weekly basis. The mother filed a postjudgment motion to alter, amend, or vacate the 2025 judgment, which the juvenile court summarily denied. The mother timely appealed.

Issues

The mother argues that the juvenile court erred in modifying the physical-custody and legal-custody provisions of the 2019 judgment.

Physical Custody

The parties agree that the 2019 judgment awarded the parties joint legal custody and awarded the mother "primary" physical custody of their two children, subject to the father's visitation rights. We construe the 2019 judgment as awarding the mother sole physical custody. See Whitehead v. Whitehead, 214 So. 3d 367, 371 (Ala. Civ. App. 2016).

When a judgment incorporating an agreement of parents awards sole physical custody of a child to one parent, the noncustodial parent must meet the standard set forth in Ex parte McLendon, 455 So. 2d 863 (Ala. 1984), to obtain a modification of the custody award. See Gallant v. Gallant, 184 So. 3d 387, 394 (Ala. Civ. App. 2014). To meet the McLendon standard, a noncustodial parent

> "must prove to the satisfaction of the trial court (1) that the circumstances upon which the original judgment was based have changed, (2) that he or she is fit to act as a custodian for the child, and (3) that '"the positive good brought about by the modification ... more than offset[s] the inherently disruptive effect caused by uprooting the child."' Ex parte McLendon, 455 So.2d 863, 865 (Ala. 1984) (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala. Civ. App. 1976))."

K.U. v. J.C., 196 So. 3d 265, 268 (Ala. Civ. App. 2015).

The mother argues, among other things, that the juvenile court did not receive sufficient evidence to support its decision to modify the physical custody of the children pursuant to the McLendon standard. This court presumes the correctness of a judgment based upon evidence presented ore tenus. Ex parte Bryowsky, 676 So. 2d 1322, 1324 (Ala. 1996).

> "'[W]e will not reverse [the judgment] unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's

4

discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow.'"

Ex parte Perkins, 646 So. 2d 46, 47 (Ala. 1994) (quoting Phillips v. Phillips, 622 So. 2d 410, 412 (Ala. Civ. App. 1993)). However, this court reviews the interpretation and application of the McLendon standard, which involve pure questions of law, de novo. Gallant, 184 So. 3d at 401.

The juvenile court received the following evidence relating to the physical-custody-modification issue. The mother testified that, since at least 2018, she has resided in a house located on her parents' farm; her parents and her grandmother reside nearby. After the parties' first child was born, the parties lived together in the mother's house, and they were still living together when their second child was born. The parties argued frequently, but there was no proven domestic violence between them. The parties ended their relationship in July 2021. After that, the children continued to live with the mother, and she was their primary caretaker, although she depended on her parents and her grandmother to help her with the children. The mother developed a stable and structured environment for the children in which she disciplined and nurtured them. The mother enrolled them in an elementary school only

five minutes from her house, and, although the children were sometimes absent from school or tardy, the children excelled academically. The children regularly attended church, and they were well-adjusted and well-behaved. The father did not criticize the upbringing of the children; he testified only that he was equally responsible for the children's success because he had also raised them.

Until February 2023, the children regularly visited with the father. According to the father, the parties did not strictly follow the visitation schedule established in the 2019 judgment; the father testified that he would keep the children for three or four days and then the mother would keep them for three or four days. The mother testified that the children had slept overnight at her house at least six days a week throughout their lives. In February 2023, the mother unilaterally suspended the visitation schedule, and the father did not regularly visit with the children after that point. The mother testified that the father was moving around frequently, was not consistent with his visits, and was not communicating with her to inform her where he was living or to arrange visits. At one point, the father lived in a dilapidated house that was uninhabitable. The mother believed that, at another point, he was

residing with friends in Boaz, which the father denied. The father testified that he had been working on the dilapidated house, which is owned by his employer, with a plan to purchase it after making it habitable, but, he said, he had abandoned the project. The father said that, after staying in that house temporarily, he had lived primarily with his grandmother and, occasionally, with his brother. In March or April 2023, he moved into a house in Somerville, approximately 20 minutes from the children's school, where he resided with his girlfriend. The father admitted that he and the mother did not communicate well.

The father testified that he did not take immediate legal action to enforce his visitation rights. In May 2023, the father attempted to visit the children on the older child's birthday. He appeared at the mother's house with a present for the older child, but, he said, the mother took the children inside her house and locked the door. The father said that he had knocked on the door repeatedly but that the mother would not allow him to enter. The father testified that he had been intent on seeing the children and giving the older child his birthday gift and that the children had expressed that they wanted to see him, but, he said, the mother was aggressively denying him his right to visit them. The father testified that

he had eventually left the mother's house but that he had returned approximately four hours later. Upon his return, the father banged on the door, waking the mother's boyfriend, who was napping inside. According to the mother's boyfriend, the father pushed open the door with his shoulder, and, when the father entered the premises, the two men "wrestled." The juvenile court reviewed a video of the scuffle taken by the mother. The mother testified that the father had choked her boyfriend and that he would not get off her boyfriend until she called the police, at which time, the mother said, the father left. The father testified that the children had been in the back of the house and that they had not witnessed that incident. The father was indicted for burglary in the third degree and domestic violence in the second degree; the charges were still pending at the time of the custody-modification trial. The mother hesitated when asked if she wanted the father to go to prison over the incident, but she ultimately testified that she did not want that to occur.

Following the May 2023 incident, the mother continued to prevent the father from seeing the children. In June 2023, the mother obtained a protection-from-abuse order against the father; the father twice violated that order in 2023 by texting the mother to reinitiate visitation.

8

He was facing criminal charges for those violations at the time of the custody-modification trial. In July 2023, the mother filed a petition in the juvenile court to modify the father's visitation rights. See note 1, supra. The father appeared in that case and denied the allegations in the petition, but his visitation did not immediately resume. The father testified that the juvenile court informally ordered the parties to abide by the 2019 judgment to enable the father to visit the children over the Christmas holidays in 2023, but, he said, the mother had only allowed him to talk to the children through a video application known as FaceTime on Christmas day.

At some point, the father commenced a contempt action against the mother for denying him visitation. On January 8, 2024, the juvenile court held a hearing on that petition, and, on January 31, 2024, the juvenile court entered a judgment finding the mother in contempt for violating the visitation provisions of the 2019 judgment on 182 occasions. Following the entry of the contempt judgment, the father began regularly visiting with the children again. The father testified that the children had been excited to renew their bond with him and that he had developed a strong relationship with the children after visitation was resumed.

9

However, the father testified that he had been denied visitation on eight occasions in 2024 and 2025, and he catalogued the numerous occasions on which the mother was late in meeting him for the visitation transfers, which, he said, had resulted in his missing approximately five hours of visitation time with the children. The mother testified that she had a valid excuse for any missed visits. The father also testified that the mother would not agree to allow the children to travel to Costa Rica with the father during the school year or to allow him extra time with the children beyond the schedule established in the 2019 judgment. Additionally, he said, the mother would not allow him to pick up the children from school. Instead, he said, the mother would pick up the children and meet the father at a nearby retail store a few minutes later. The father estimated that the mother had been 80% in compliance with the visitation schedule since the contempt hearing.

On March 8, 2024, the father filed his petition to modify the custody provisions of the 2019 judgment. The father testified that the mother had not exercised good judgment or acted in the best interests of the children by denying him visitation for close to one year. The father also said that the mother was being petty by not allowing him more time with

the children. The father testified that he wanted to split custody of the children with the mother on a rotating weekly basis. The mother testified that she did not believe that it would be in the best interests of the children to swap custody back and forth each week. The mother said that she had established a good routine for the children that was benefiting them and that it would be best for her to remain their sole physical custodian. The mother believed that the 2019 judgment should be modified only to provide a more structured and detailed visitation schedule.

The evidence in the record shows that the parties have been involved in a visitation dispute since February 2023, when the mother unilaterally suspended visits between the father and the children. In January 2024, the juvenile court determined that the mother was in contempt of the visitation provisions of the 2019 judgment. After entry of the January 2024 judgment, visitation resumed, but the mother has not been completely faithful to the visitation schedule, and she has not allowed the father any additional visitation that he has requested. The father maintained that the mother had not acted in the best interests of the children in curtailing his visitation, and he requested that the

11

juvenile court modify the custody of the children so that he would exercise physical custody over them on a rotating weekly basis instead of being limited to visitation with them according to the schedule established in the 2019 judgment.

"[M]odification of custody is not the proper remedy for a visitation dispute. ... 'Rather, the appropriate remedy in such a situation is to punish the custodial parent for contempt, not to uproot the children.'" Cochran v. Cochran, 5 So. 3d 1228-29 (quoting Lami v. Lami, 564 So. 2d 969, 970 (Ala. Civ. App. 1989)). However, a trial court may consider modifying custody when it is shown that a custodial parent has denied visitation as part of an effort to deliberately obstruct the relationship between the child and the noncustodial parent. In Fricks v. Wood, 807 So. 2d 561, 564 (Ala. Civ. App. 2001), the Autauga Circuit Court entered a divorce judgment incorporating an agreement between the parties, pursuant to which the wife was to be the sole physical custodian of the child born during the parties' marriage. After the divorce, the wife remarried and listed her new husband as the father of the child for school purposes, not even allowing her former husband to pick up the child from school. The wife denied the former husband scheduled visitation. The

circuit court modified the divorce judgment to award the former husband sole physical custody of the child. On appeal, this court determined that the circuit court could have reasonably concluded that the wife was deliberately obstructing the relationship between the former husband and the child, and we affirmed the judgment. See also C.J.L. v. M.W.B., 879 So. 2d 1169, 1180 (Ala. Civ. App. 2003).

However, even in cases in which a noncustodial parent claims that the custodial parent is alienating the child by withholding visitation, the burden still rests on the noncustodial parent to prove each element of the McLendon standard.

> "The McLendon standard creates a '"rule of repose"' by '"allowing the child ... the valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood."' Ex parte McLendon, 455 So. 2d at 865 (quoting Wood v. Wood, 333 So. 2d [826,] 828 [(Ala. Civ. App. 1976)]). The McLendon standard is designed 'to minimize disruptive changes of custody because this Court presumes that stability is inherently more beneficial to a child than disruption.' Ex parte Cleghorn, 993 So. 2d [462,] 468 [(Ala. 2008)]. When implementing the McLendon standard, a trial court should allow a transfer of custody 'only after a sifting inquiry to assure that the stability and other interests of the child ... have been properly considered.' Gallant v. Gallant, 184 So. 3d [387,] 399 [(Ala. Civ. App. 2014)]."

13

K.U., 196 So. 3d at 272. "To affirm the judgment modifying the physical custody of the child, this court must discern the evidence from which the juvenile court could have reasonably inferred that the interests of the child would be 'materially promoted' by a change in custody." Id. at 277. In Fricks, this court did not affirm the judgment solely because the former husband proved that the wife was attempting to alienate the child from him, but because he also showed that his "home would provide a more suitable environment for the child's development." 807 So. 2d at 564. This court cited evidence indicating that the wife had remarried an alcoholic, that the child was being abused in the wife's home, and that the wife and her new husband were planning to move the family to Germany. On the other hand, the former husband had remarried and kept a suitable home with his new wife and the child's half sibling, with whom the child had a strong and nurturing relationship.

In this case, the father did not dispute that the mother was providing good care for the children and that they were thriving under the current custody arrangement. He insisted only that he also should be credited for his efforts in raising the children under that same custody arrangement. The father failed to present any evidence as to how the

children would benefit from a modification of the current custody arrangement. The children had lived with the mother their entire lives, and, despite not having seen the father for close to one year, according to the father, they maintained a strong relationship with him. The father did not demonstrate how removing the children from the only home they had ever known, where the mother provided a safe, structured, and nurturing environment in which the children were surrounded by caring relatives, and alternating their custody on a week-to-week basis would improve their lives. The father did not present any evidence regarding the conditions of his housing, the relationship between the children and his girlfriend, with whom he lived, his plan of care for the children when he could not be present, his intentions regarding their church attendance, or any efforts that he would make to counteract the disruption in their lives that would be caused by a modification of custody. Without that vital evidence, the juvenile court could not have reasonably determined that the father had met the McLendon standard.

We do not condone the mother's conduct in unilaterally suspending visitation between the father and the children and in blocking the father from visiting with the children on the older child's birthday. Reviewing

the 29 paragraphs of the 2025 judgment, it is evident that the juvenile court went to great lengths to clarify the rights and responsibilities of the parties and to regulate their relationship to prevent any further obstruction by the mother. However, the juvenile court exceeded its discretion in modifying the physical custody of the children. We believe many of the provisions in the 2025 judgment would be appropriate to assure the father significant and meaningful time with the children and to reduce further visitation disputes between the parties, but the juvenile court did not receive sufficient evidence to justify changing custody even to joint physical custody. We, therefore, reverse the judgment insofar as it modifies the physical custody of the children.[2]

## Legal Custody

The mother also argues that the juvenile court erred in modifying the legal custody of the children. The 2019 judgment awarded the mother final decision-making authority for education and health-care matters; it did not address civic, cultural, athletic, and other matters. The 2025 judgment awards the father final decision-making authority over civic,

---

[2]The mother has raised other arguments for reversing the modification of the physical-custody provision of the 2019 judgment, but, based on our disposition, we pretermit discussion of those arguments.

16

cultural, athletic, and healthcare matters; the mother was awarded the same authority over religious and academic matters. The mother argues that the juvenile court did not receive sufficient evidence to modify legal custody.

Pursuant to Ala. Code 1975, § 30-3-153, a trial court may enter an order

> "[d]esignating the parent possessing primary authority and responsibility regarding involvement of the minor child in academic, religious, civic, cultural, athletic, and other activities, and in medical and dental care if the parents are unable to agree on these decisions. The exercise of this primary authority is not intended to negate the responsibility of the parties to notify and communicate with each other as provided in [Title, Chapter 3, Article 7, Ala. Code 1975]."

A trial court may modify an order designating one parent as the final decision-making authority if the trial court finds that the best interests of the child will be served by the modification. See Harris v. Harris, 775 So. 2d 213, 215 (Ala. Civ. App. 1999). In making that determination, the trial court exercises considerable judicial discretion, and its decision will not be disturbed unless the trial court exceeds its discretion or unless the judgment is plainly or palpably wrong. Hodgins v. Hodgins, 84 So. 3d 116, 125 (Ala. Civ. App. 2011).

The father did not present any evidence establishing that it would be in the best interests of the children to modify the 2019 judgment insofar as it awarded the mother final decision-making authority over the children's medical and dental care. The record contains no evidence regarding the medical and dental care the children were receiving, the decisions the mother was or was not making concerning that care, or the reason why the father should now have the right to make those decisions in the event of a disagreement between the parties. The juvenile court did not have any evidentiary basis for modifying the 2019 judgment insofar as it designated the mother as the final decision-making authority regarding the children's health care.

The father also failed to present any evidence demonstrating that it was in the best interests of the children to award him final decision-making authority over the children's civic, cultural, and athletic activities. The father testified that the mother had failed to personally provide him with a schedule for the children's Tee-ball games, but the mother testified that the father had obtained the schedule independently. The record contains no other reference to the children's athletic activities or their civic and cultural activities. The father presented no evidence

indicating that the parties had ever disagreed over the civil, cultural, or athletic activities of the children or evidence to justify awarding him superior decision-making authority over those activities. Thus, the juvenile court lacked sufficient evidence to modify the 2019 judgment, which did not afford either parent final decision-making authority over the children's civil, cultural, and athletic activities.

For the foregoing reasons, we reverse the judgment insofar as it modified the provision of the 2019 judgment regarding final decision-making authority.

## Conclusion

The juvenile court did not receive sufficient evidence to sustain its judgment modifying the physical and legal custody of the children. Therefore, we reverse the judgment and remand the case for the entry of a judgment consistent with this opinion.

REVERSED AND REMANDED.

Edwards, Hanson, Fridy, and Bowden, JJ., concur.