THOMPSON, Judge.
James Wesley Scroggins (“the father”) and Tracy Leigh Templeton (“the mother”) were divorced by a June 22, 1998, judgment of the trial court (hereinafter “the divorce judgment”). The divorce judgment awarded the mother legal and physical custody of the parties’ two children, a daughter, born on January 7, 1994, and a son, born on October 4, 1995. On July 19, 1999, the trial court modified custody of the children pursuant to an agreement of the parties; the father was awarded legal and physical custody of the children, and the mother was awarded weekend visitation.
On June 26, 2002, the mother filed a petition for a modification of custody. The father answered. The trial court held a final hearing on December 18, 2002, at which it received ore tenus evidence. On January 27, 2003, the trial court entered a judgment granting the mother’s petition to modify, awarding the mother and the father joint legal custody of the children, and awarding the mother physical custody of the children. The father appealed.
*1019 Where a trial court receives ore terms evidence, its judgment based on that evidence is entitled to a presumption of correctness on appeal and mil not be reversed absent a showing that the trial court abused its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ. App.1995). “Th[is] presumption of correctness is based in part on the trial court’s unique ability to observe-the'parties and the witnesses 'and to evaluate their credibility and demeanor.” Littleton v. Littleton, 741 So.2d 1083, 1085 (Ala. Civ. App.1999). This court is not permitted to reweigh the evidence on appeal and substitute its judgment for that of the trial court. Somers v. McCoy, 777 So.2d 141 (Ala.Civ.App.2000).
The testimony presented at the hearing reveals the following facts. The father lives in a two-bedroom, one-bathroom mobile home in Somerville. The father testified that he is employed with Tennessee Valley Recycling as a truck driver but that he has not worked since June 2001 due to a work-related injury to his back that he suffered on January 22, 2001. The father testified that he has had two surgeries on his back — a micro-disketomy in March 2001 and a double-fusion in March 2002. According to the father, he cannot run, bend, or lift more than 10 pounds, and he uses a cane when he walks. The father testified that his injury does not limit him from doing chores around the house. According to the father, he can prepare meals, clean the house, wash clothes, and drive a car. The father testified that his only sources of income are his workers’ compensation benefits and child support.[1]
The mother lives in a three-bedroom, one-bathroom brick house in Decatur; the mother testified that she lives approxb mately 15 miles away from the father. The mother shares that house with her husband, Michael Templeton, and the mother’s three-year-old child from another relationship. The mother testified that she is employed full-time with the Racking Horse Breeders' Office as a registration clerk and that she earns $7.50 per hour. According to the mother, her husband works in home -health care and primarily works on the weekends. ■ • .
Testimony revealed that the children, particularly the daughter, ■ had been enrolled in several schools while in the father’s custody. The father testified that 'the daughter had been enrolled in kindergarten at Cotaco ’ School in Somerville but that he had removed her from that school and had placed her in’‘ kindergarten at Laceys Spring Elementary School because that school’s day care would transport the daughter to school. In February 2000, the father moved to Ohio with the children, but he returned to Alabama 'in August 2000. The father testified that, following their return to Alabama, the children attended Priceville Elementary School; the children had attended that school for two years at the time of the hearing. The mother testified that if the children were returned to her custody, they would attend Somerville Road Elementary School.[2]
At the time of the hearing, the daughter was in third grade at Priceville Elementary School. The daughter’s 2002-2003 report card was admitted into evidence at the hearing, and it revealed that the daughter was working below grade level. The report card reflected that the daugh *1020 ter continuously failed to turn in her class work. The daughter’s first- and second-term grades indicated that she had average or below-average grades. The father testified that he had attended parent-teacher conferences and had helped the daughter with her homework. According to the father, the mother did not show any interest in the children’s schoolwork or attend parent-teacher conferences. The mother testified that she had never been notified of any parent-teacher conferences but that she had spoken with the children’s teachers.
The mother testified that when she picks the children up on Friday afternoon for her scheduled weekend visitation, the children are dirty and unkempt. The mother testified that she had picked the daughter up for visitation on several occasions when the daughter did not have on panties. According to the mother, when she asked the daughter why she did not have panties on, the daughter responded by saying “that she did not have time to do the laundry.” The father testified that he has caught the daughter going without panties on two occasions. The father stated that the daughter did not do the laundry or housework. According to the father, he pays the children an allowance to clean their bedrooms; he also pays the daughter to wash dishes, and he pays the son to clean the bathroom.
The mother testified that the daughter’s behavior had changed after the father was injured at work. According to the mother, the daughter, who was 8 years old at the time of the hearing, had turned into a “little adult.” The mother opined that the father was placing too many household responsibilities on the daughter. Douglas McCoy, the mother’s brother, testified that in the summer of 2002 he had attempted to take the children to Dawson to visit with his family for one week. According to McCoy, on the day he arrived to pick the children up, the father refused to let the daughter go because he needed her to help him. McCoy testified that the father could not physically get up at that time. McCoy testified that the children were upset when they were told that they could not go with him.
The mother and the father testified that the seven-year-old son had talked about killing himself. Sue McCoy, the children’s maternal grandmother, testified that the son had discussed what it would be like to drive a car off of a bridge or into a building once he could drive. According to the father, the son constantly plays video games. The mother and the father testified that the son plays games that are not violent; however, the mother testified that the son had mentioned playing “Grand Theft Auto” at the father’s house on the father’s computer.
The mother testified that the father’s mobile home is filthy; the mother last went into the father’s mobile home approximately one year before the hearing. According to the mother, the children share the same bedroom and sleep on bunk beds. The father testified that the children have separate bedrooms and that he sleeps on the couch. Donnie Kent, one of the father’s neighbors, testified that he had been in the father’s mobile home and that the children had separate bedrooms. According to Kent, the mobile home is “pretty clean” and the children are well cared for by the father.
The maternal grandmother testified that she usually sees the children once per week and that she was last in the father’s mobile home in June 2002. The grandmother testified that the children share a bedroom. According to the grandmother, the mobile home was in bad condition in June 2002, with trash piled up, clothes strewn everywhere, dirty toilets, and a terrible smell that permeated the home.
*1021 The mother testified that the refrigerator in the mobile home is full of liquor and beer; the father stated that he does not consume alcohol often. The maternal grandmother testified that in June 2002 she observed alcohol and only a little food in the father’s refrigerator. The mother and the grandmother testified that on Sundays they would return the children to the father after weekend' visitation, and on several occasions they observed a man entering the father’s home carrying a case of beer.
According to the mother, the father is easily angered. The mother stated that she had heard the father yell at the children and use profanity in front of them. The mother testified that the father gets mad at her for cleaning' the daughter’s glasses. The mother stated that the father does not want anyone cleaning the daughter’s glasses more than once per week. The maternal grandmother testified that she was present in the mobile home one day when the father screamed at the daughter for allowing the mother to clean her glasses. The grandmother further testified that she stopped going to the father’s mobile home because he yelled at the children and this upset her; the grandmother continued to visit the children with the mother on the weekends.
The mother testified that on one occasion the father upset the daughter when he took a nude picture of her after she fell out of the bathtub. The father testified that he took a nude picture of the daughter in April 2001 with his digital camera and that he put the picture on his computer. The father testified that he took the picture as a personal keepsake and that he deleted the picture shortly after putting it on the computer because the daughter got upset. . The maternal grandmother,- who was in the mobile home at the time the father took the picture, testified that the daughter fell in the bathtub twice and that when she attempted to go check on the daughter, the father stopped her.
The mother testified that she agreed to modify custody of .the children during a time when her father was very ill; the mother lived with her father until his death from lung and kidney failure in August 2000. In addition to caring for her father, the mother testified that, at the time she agreed to modify custody of the children, she had just given birth by cesarean section to her third child, she was battling severe depression, and she was unemployed. According to the mother, at the time she agreed to modify custody of the children, the father was not disabled. The father testified that the mother agreed to modify custody in June 1999 because, he claims, the mother stated, “she could not handle it anymore.” The mother testified that she wants custody of the children because the son cries when the mother returns him to the father after visitation and because of the changes in the daughter’s behavior and demeanor. The father acknowledged that the son had requested to move back in with the mother. The mother testified that she is also concerned about the children’s schoolwork and about the children living in the same bedroom. .
Dianna Miller, the father’s sister, testified that the mother lived with her while the mother’s house was being repaired. According to Miller, the mother could have sought custody of the children after the death of the mother’s father, but did not. Miller opined that the mother did not want the children at that time. Miller testified that the children were well cared for while in the custody of the father and that the mobile home was clean the few times she had been there.
The guardian ad litem, appointed by the trial court at the request of the mother, *1022 testified that she had had a thorough interview with the children and was of the opinion that the children should remain with the father.
The father contends on appeal that the evidence does not support a modification of custody under the applicable standard of review.
“When this Court reviews a trial court’s child-custody determination that was based upon evidence presented ore ten-us, we presume the trial court’s decision is correct: ‘ “A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong....’” Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. ‘In child custody cases especially, the perception of an attentive trial judge is of great importance.’ Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ. App.1981). In regard to custody determinations, this Court has also stated: ‘It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).”
Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001).
A parent seeking to modify custody must demonstrate that a change in custody would materially promote the child’s welfare and that the disruption caused by the change in custody would be offset by the advantages of that custody change. Ex parte McLendon, 455 So.2d 863 (Ala.1984). In its judgment, the trial court -found that the mother had met the standard for the modification of custody set forth in Ex parte McLendon, supra. The trial court’s judgment specifically found “that there [was] a material change in circumstances sufficient to justify a change in custody due to the injury and disability of the father, and his change in temperament.” The trial court also found that the mother had improved her situation and would provide a more suitable home for the children. The trial court’s judgment provided that the children would remain in their current school through the end of the school year.
The father argues on appeal that his disability does not prevent him from being a good parent to the children. While it is apparent that the father loves the children, the evidence presented before the trial court reveals that the father’s parenting skills were adversely affected by his disability. The parties presented two conflicting pictures of the father’s health. The father testified that he is capable of cooking and cleaning and that he does the laundry; however, the father testified that, because of his two surgeries, he cannot bend or lift more than 10 pounds. The maternal grandmother and mother both testified that the father’s home was not clean. Testimony revealed that the son, and particularly the daughter, had been required to assume additional responsibilities around the house since the father was injured; at the time of the hearing the daughter was 8 years old and the son was 7 years old. The father acknowledged the benefit of the children’s assistance and testified that he paid them an allowance for that assistance. It is not the job of this *1023 court to resolve conflicting testimony; that job is left to the trial court. See Jones v. LeFlore, 421 So.2d 1287 (Ala.Civ.App.1982) (holding that it is the duty of the trial court to resolve conflicts in the evidence). Therefore, we cannot say that the trial court abused its discretion by modifying custody in light of the father’s disability.
The father also argues that there was insufficient evidence of a change in his temperament. According to the mother and the maternal grandmother, the father yelled and cursed at the children. Testimony revealed that during one incident the father screamed at the daughter and the mother for cleaning the daughter’s eyeglasses. While we might agree with the father that the evidence of his change in temperament in the record before us on appeal is minimal, we cannot say that the trial court erred in determining that there had been a change in the father’s temperament where the trial court was in the unique position to observe the father’s demeanor and credibility at trial. See Ex parte Fann, supra.
The record revealed that the daughter was struggling in school and that her grades had fallen since the father’s injury. The daughter had responsibilities at home that went beyond those of a normal eight-year-old child, and, in conjunction with those responsibilities, her grades had declined. The son expressed a desire to live with the mother; the father acknowledged the son’s preference at trial.
It would appear that, at the time the mother agreed to modify custody of the children, the interests of the children were best served by being in the care, custody, and control of the father. Wflien the children were initially placed in the father’s custody, he was not disabled and maintained full-time employment. Following the father’s injury, the father suffered from physical limitations that hindered his ability to care for the children, both physically and financially. The evidence, also supports a conclusion that the father suffered a change in temperament. While the children were in the custody of the father, the mother remarried, obtained full-time employment, and moved into a new house close to the father and the children.
The trial court determined that the mother had met the McLendon standard and that a change in custody would serve the children’s best interests. Although this court might not have entered the same judgment as did the trial court, given the evidence in the record on appeal, we are unable to say that the trial 'court’s custody determination constituted an abuse of its discretion. See Ex parte Fann, supra.
The father has failed to demonstrate that the trial court erred in entering its custody judgment. The judgment of the trial court is affirmed.
AFFIRMED.
YATES, P.J;, and PITTMAN and MURDOCK, JJ., concur.
CRAWLEY, J., dissents.

. The record does not contain the amounts of workers’ compensation benefits and child support that the father receives.

. Although the mother lives 15 miles from the father, her home is located in another school district.