BRYAN, Justice.
D.B. and K.S. petitioned this Court for a writ of certiorari seeking review of the judgment of the Court of Civil Appeals affirming, without an opinion, a custody-modification judgment awarding K.S.B. ("the mother") custody of her daughter ("the child"). D.B. v. K.S.B. (No. 2150850, February 3, 2017), 241 So.3d 669(Ala. Civ. App. 2017) (table). We granted the petition, and we reverse the judgment of the Court of Civil Appeals and remand the cause for further proceedings.
Facts and Procedural History
The child was born in April 2007. D.B., the child's maternal grandfather ("the grandfather"), and K.S., the child's maternal stepgrandmother ("the stepgrandmother") (the grandfather and stepgrandmother are hereinafter referred to collectively as "the grandparents"), petitioned for custody of the child after the mother telephoned the grandfather in May 2010 and asked him to come get the child because she was "being mean" to the child. The mother did not appear at the hearing on the grandparents' custody petition, and the juvenile court awarded custody of the child to the grandparents in August 2010.
On February 29, 2016, the mother filed a petition to modify custody. Based on the juvenile court's August 2010 custody judgment in favor of the grandparents, it is undisputed that, in order to succeed in her request to modify custody, the mother was required to meet the well settled custody-modification standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala. 1984) :
" 'Where a parent has transferred to another [whether it be a non-parent or the other parent], the custody of h[er] infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless [s]he can show that a change of the custody will materially promote h[er] child's welfare.'
" Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947), quoting the Supreme Court of Virginia, Stringfellow v. Somerville, 95 Va. 701, 29 S.E. 685, 687, 40 L.R.A. 623 (1898).
*757 "Furthermore,
" '[This] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.'
" Wood v. Wood, 333 So.2d 826, 828 (Ala. Civ. App. 1976).
"It is not enough that the parent show that she has remarried, reformed her lifestyle, and improved her financial position. Carter v. Harbin, 279 Ala. 237, 184 So.2d 145 (1966) ; Abel v. Hadder, 404 So.2d 64 (Ala. Civ. App. 1981). The parent seeking the custody change must show not only that she is fit, but also that the change of custody 'materially promotes' the child's best interest and welfare."
455 So.2d at 865-66.
The brief record from the hearing on the mother's petition to modify custody contains the following pertinent evidence, presented ore tenus. At the time of the hearing, the child was nine years old and had been living with the grandparents since she was three years old. In the six years the child had been in the custody of the grandparents, the mother had begun regularly visiting the child only four months before the hearing. According to the mother, during those four months, she and the child had developed "a pretty strong bond."
The mother presented evidence indicating that she had a history of mental illness and drug abuse, which led to her being unable to care for the child in 2010. After the mother asked the grandparents to care for the child, she was imprisoned for two years; she was released in 2012. The mother testified that she had been misdiagnosed as bipolar for several years but that she was now able to control her mental condition-borderline personality disorder -with medication. The mother further testified that she had been drug-free, other than medication for her mental condition, for six years preceding the hearing. In December 2014, the mother married Y.B., an Army veteran. Y.B. had been diagnosed with post-traumatic stress disorder, and, according to the mother, Y.B. receives treatment for that condition approximately once a year. The mother stated that Y.B. is supposed to seek treatment more often but they had "kind of slacked up on it."
The mother and Y.B. live in a house Y.B. owns in Spanish Fort. The mother testified that she has two children in addition to the child and that both of those children live with her in the home she shares with Y.B. Her son, who was 11 years old at the time of the hearing, is autistic and had lived with the mother for only one year before the hearing. The mother testified that her son was born in 2005, that she was involved in drugs at that time, and that she decided it was in her son's best interest for him to live with her mother, the son's maternal grandmother. The maternal grandmother and her husband adopted the son in 2007, but, beginning approximately one year before the hearing in the present case, the maternal grandmother and her husband allowed the son to begin living with the mother. The mother testified that the child and her son "have a wonderful *758 relationship," that they are "elated" when they are together, and that "the love between ... them is very strong." The mother also has a six-month-old daughter with Y.B.
The maternal grandmother testified that the mother had turned her life around after she was released from prison and that she had married a wonderful man, so she decided to let the son live with the mother and her husband on a trial basis. According to the maternal grandmother, that has worked out very well, and she thinks the mother would be able to care for another child in her home.
When asked why she believed it was in the best interest of the child for her to be awarded custody, the mother stated:
"I think that ... a little girl needs her mother. I think that I can care for her and ... love her just as much as where she's been for the last six years. They have taken good care of her. I do not argue that. They have taken good care of her but I can take care of her as well. She is ... my daughter and I can take care of her."
Additionally, she stated that the child has a good relationship with her siblings and that it would be better for the child to live with her siblings and her mother.
The grandfather testified that, in the six years he and the stepgrandmother had custody of the child, they had devoted all of their time and effort to caring for the child and the stepgrandmother had chosen not to return to work so she could stay home to care for the child. He stated that the mother did not ask to see the child after she was released from prison and that, though he offered, the mother did not come to live with him, the stepgrandmother, and the child after she was released from prison.
The stepgrandmother testified that she had been married to the grandfather for 28 years and that they loved the child "to death." The stepgrandmother potty-trained the child after the grandparents obtained custody, and she became actively involved in the child's schooling; she testified that she had taught "smart-board lessons" in the child's classroom, that she had been on all of the child's field trips in the past year, that she had served as "room mom" and an "assistant room mom," and that she had joined the PTA. The grandparents live in a neighborhood in Daphne where the child has friends and they take the child to church with them. The stepgrandmother stated that she had been diagnosed with breast cancer in March 2016. However, the record reveals only the following evidence on that subject:
"[The grandparents' attorney]: Ma'am, in your health situation right now, can you describe that to the court?
"[The stepgrandmother]: Well, I was diagnosed in March with breast cancer. I'm undergoing chemotherapy. And I finish in-the tumor's shrinking. And I finish in August.[1 ] And I will be cured.
"[The grandparents' attorney]: Has that in any way affected your ability to take care of [the child]?
"[The stepgrandmother]: No, no. I have no side effects except no hair."[2]
On June 17, 2016, the juvenile court entered a final judgment awarding the mother custody of the child after finding that she had met the custody-modification standard set forth in Ex parte McLendon, and the court set forth a schedule for a gradual transfer of physical custody from the grandparents to the mother. The *759 grandparents filed a postjudgment motion, arguing that the mother had presented insufficient evidence to meet her burden under Ex parte McLendon. At the hearing on their postjudgment motion, the juvenile court stated:
"I am not going to vacate the order. I feel like ... the testimony bore out that the situation at the grandparents' home was not what it once was, that there's been some illness, that there's been some other things going on at the house that would make it such that, not only had mom's situation improved, but the grandparents' situation had diminished."
(Emphasis added.)
The grandparents appealed the juvenile court's custody-modification judgment, and the Court of Civil Appeals affirmed the judgment by issuing an order without an opinion pursuant to Rule 53, Ala. R. App. P. This Court granted the grandparents' petition for certiorari review to consider whether the Court of Civil Appeals' decision conflicts with Ex parte McLendon, supra.
Discussion
The grandparents contend that there was insufficient evidence to support the juvenile court's judgment and that the Court of Civil Appeals' affirmance of that judgment conflicts with Ex parte McLendon. In its no-opinion affirmance in this case, the Court of Civil Appeals cited, among other cases discussed herein, K.U. v. J.C., 196 So.3d 265, 268-69 (Ala. Civ. App. 2015) ; the part of that case to which the pinpoint citation in the Court of Civil Appeals' no-opinion affirmance directs us provides, in pertinent part:
" ' "Where a parent has transferred to another [whether it be a nonparent or the other parent], the custody of his [or her] infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he [or she] can show that a change of the custody will materially promote his [or her] child's welfare." '
" Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947) (quoting Stringfellow v. Somerville, 95 Va. 701, 29 S.E. 685, 687 (1898) ). To meet that burden, the party petitioning for modification must prove to the satisfaction of the trial court (1) that the circumstances upon which the original judgment was based have changed, (2) that he or she is fit to act as a custodian for the child, and (3) that ' "the positive good brought about by the modification ... more than offset[s] the inherently disruptive effect caused by uprooting the child." ' Ex parte McLendon, 455 So.2d 863, 865 (Ala. 1984) (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala. Civ. App. 1976) ). On appeal, this court presumes the correctness of a judgment based upon evidence presented ore tenus. Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).
" ' "[W]e will not reverse [the judgment] unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow." '
" Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994) (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala. Civ. App. 1993) ). However, this court reviews the interpretation and application of the McLendon standard, which involve pure questions of law, de novo. Gallant v. Gallant, 184 So.3d 387, 401 (Ala. Civ. App. 2014)."
*760 After a thorough review of the record, we agree with the grandparents that the Court of Civil Appeals' decision in this case conflicts with the custody-modification standard set forth in Ex parte McLendon. Even if we assume that there was sufficient evidence to support a finding that there had been a material change in circumstances since the August 2010 custody judgment awarding custody to the grandparents and that the mother is now fit to have custody of the child, see K.U., supra, there was insufficient evidence to support a conclusion that a change in custody would materially promote the best interest and welfare of the child so that the positive good brought about by the modification would more than offset the inherently disruptive effect of the change in custody.
Initially, we must address the emphasized part of the above-quoted statement made by the juvenile court at the hearing on the grandparents' postjudgment motion because it provides insight into the juvenile court's decision to modify custody and it explicitly provides the court's reasoning for denying the grandparents' postjudgment motion. The juvenile court refused to vacate the custody-modification judgment because it believed that the evidence indicated that, in addition to the stepgrandmother's "illness," there were "other things going on at the [grandparents'] house that would make it such that ... the grandparents' situation had diminished." However, we have carefully reviewed the record in this case and we have found no evidence to support that conclusion. Indeed, the only evidence in the record indicating that something was "going on" at the grandparents' house was evidence indicating that the stepgrandmother was diagnosed with breast cancer shortly after the mother filed her petition to modify custody of the child.
Thus, we are left to consider the evidence that was actually presented to the juvenile court and to determine whether that evidence supported the juvenile court's implicit conclusion, which is inherent in the court's finding that the mother met her burden pursuant to Ex parte McLendon, that a change in custody would materially promote the best interest and welfare of the child so that the positive good brought about by the change in custody would more than offset the inherently disruptive effect of the change. The mother, in her brief to this Court, argues that, in light of the evidence that the stepgrandmother had been diagnosed with cancer and that, if the mother was awarded custody, the child would have the opportunity to live with her siblings,[3] there was sufficient evidence to support the juvenile court's judgment.
In support of its no-opinion order affirming the juvenile court's judgment, the Court of Civil Appeals cited Scroggins v. Templeton, 890 So.2d 1017, 1022 (Ala. Civ. App. 2003). In that case, the father had custody of the parties' two children, who were eight and seven years old, and the mother petitioned to modify custody. The trial court determined that the mother met the McLendon standard based on the fact that, since he had been awarded custody, the father had become disabled and had a negative change in temperament. The evidence indicated that the father had injured his back in a work-related accident and that this injury was having a negative impact on the children. For example, the father was no longer able to run, bend, or lift more than 10 pounds, and the children had been enlisted to do household chores *761 the father was no longer able to do. Additionally, the mother presented evidence indicating that the children were "dirty and unkempt," that the father's house was not clean, and that one child occasionally did not wear underwear when the child did not have time to do laundry. Scroggins, 890 So.2d at 1020. The evidence also indicated that a family member had arranged to take the children to visit other family members for one week, but when they got to the father's house to pick up the children, the father would not allow the eight-year-old child to go on the trip because he needed her to help him; the father was unable physically to get up at that time. The father appealed the custody-modification judgment in favor of the mother, and the Court of Civil Appeals affirmed. The Court of Civil Appeals held that the Ex parte McLendon burden was satisfied because the evidence indicated that "the father's parenting skills were adversely affected by his disability," Scroggins, 890 So.2d at 1022, while the mother had "remarried, obtained full-time employment, and moved into a new house close to the father and the children." 890 So.2d at 1023.
To the extent, if any, that the Court of Civil Appeals cited Scroggins in its no-opinion affirmance to support a conclusion that the juvenile court could have considered the stepgrandmother's cancer diagnosis as the basis for concluding that a change in custody would materially promote the best interest and welfare of the child, under the circumstances presented in this case, the court erred. The present case is distinguishable from Scroggins because there is no evidence in the record indicating that the stepgrandmother's illness affected her ability to care for the child in any way. For all that appears in the record, the stepgrandmother was well on her way to completing her treatment, and hair loss was her only side effect. In fact, the mother failed to present any evidence indicating that the stepgrandmother's diagnosis affected the child in any way.
Even if we assume that the juvenile court did not believe the stepgrandmother to be as healthy as she indicated she was, there is no evidence from which we could infer that, even under such circumstances, the best interest of the child would be materially promoted by changing custody because doing so would require removing the child from the home of the only stable parental figures she has ever known. The record indisputably shows that the grandparents, for all purposes, have been the child's parents for most of her life; the child calls the stepgrandmother "mom," the grandparents have been actively involved in the child's schooling and her religious upbringing, and, in their own words, the child had become "the center of [their] life." On the other hand, the mother began regularly visiting the child, for the first time in six years, only four months before the juvenile court awarded her custody of the child. Surely, under such circumstances, evidence of a custodial "parent's" cancer diagnosis, in and of itself, is insufficient to support a conclusion that the best interest of the child would be materially promoted by a change in custody, especially where, as here, the child would be removed from a stable home and exemplary caretakers. Accordingly, we cannot conclude that evidence of the stepgrandmother's illness provided a basis for finding that the child's best interest would be materially promoted by a change in custody so as to overcome the inherently disruptive effect of the change.
Regarding the child's ability to live in the same house as her siblings, we note that there is no evidence indicating that this is a situation where the child would have the opportunity to be reunited with *762 siblings she once lived with. The mother's son was adopted by the maternal grandmother and her husband around the same time the child was born, and there is no evidence in the record indicating that the child and the mother's son ever lived together in the same house.
The Court of Civil Appeals also cited M.R.J. v. D.R.B., 34 So.3d 1287, 1291-92 (Ala. Civ. App. 2009), in its no-opinion affirmance to support its judgment in this case. In M.R.J., the mother had custody of the parties' child, and the father petitioned to modify custody. The juvenile court awarded the father custody after concluding that he met the McLendon standard. The evidence indicated that the mother had moved approximately 12 times in 4 years, that she had left the child in a hotel unsupervised while she went to a Wal-Mart department store and stole diapers, that she failed to show up to visitation exchanges, and that she failed to apprise the father of her telephone number when it changed. The evidence indicated that the father, on the other hand, had been employed by the same company for two years, had lived in the same house for one year, and was able to provide for the child better than the mother could. In the part of M.R.J. to which the pinpoint citation in the Court of Civil Appeals' no-opinion order in the present case directs us, the court stated:
"[The father] also testified that the child gets along well with him, his wife, and the child's half siblings. Further, the father's wife testified that she does not work outside the home and that she will be available to care for the child full-time. Based on that evidence, the trial court could have determined that the 'change in custody will materially promote the child's best interests, and that the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child.' Adams[ v. Adams ], 21 So.3d [1247,] 1252 [ (Ala. Civ. App. 2009) ]."
34 So.3d at 1291-92.
After considering all the facts presented in this case, we must conclude that M.R.J. is distinguishable from the present case and does not support a conclusion that the evidence in this case was sufficient to support a finding that the best interest of the child would be materially promoted by a change of custody. Although there was evidence, like there was in M.R.J., indicating that the child gets along well with her siblings and that she loves them, unlike the overwhelming evidence presented in M.R.J., there is no evidence in the present case of any instability in the grandparents' home or any evidence indicating that the grandparents ever put the child in danger. To the contrary, the evidence indicated that the grandparents were nothing short of model custodians for the child and that they indisputably provided the child with a safe, loving, and stable home.
The facts in this case are remarkably similar to the facts in Ex parte McLendon. In that case, the mother agreed to allow the child's paternal grandparents to have custody of her child when the mother divorced the child's father, and the paternal grandparents had custody of the child for approximately five years. During that time, the mother had infrequent visits with the child, and it was undisputed that the paternal grandparents provided a good home for the child. At the time the mother petitioned to modify custody, she had remarried and was able to provide a stable home for the child; the mother and her new husband also had a child together, the child's half sibling, who lived in their home. The circuit court entered an order modifying custody in favor of the mother, and the Court of Civil Appeals affirmed that order on appeal. This Court, however, reversed *763 the Court of Civil Appeals' judgment. The Court noted that a natural parent loses his or her prima facie right to custody of his or her child "after a voluntary forfeiture of custody or a prior decree removing custody from the natural parent and awarding it to a nonparent." Ex parte McLendon, 455 So.2d at 865 (citing, among other cases, Ex parte Mathews, 428 So.2d 58 (Ala. 1983) ). After setting forth the applicable custody-modification standard, the Court stated:
"We have examined the record carefully and conclude that the parties are equally capable of taking care of the child, and that both would provide her with a nurturing, loving home. The most that the mother has shown is that her circumstances have improved, and she is now able to provide for the child in the same manner in which the grandparents have been providing for her. She failed to show that changing the custody materially promotes the welfare and best interest of the child."
455 So.2d at 866.
The same is true in the present case. The mother conceded that the grandparents had taken good care of the child, and she expressed no concerns in the juvenile court regarding the grandparents as custodians of the child; the mother simply testified that she believed that she could take care of the child and love her just as well as the grandparents. Ex parte McLendon requires more.
We are mindful, of course, of the deference owed to the juvenile court's judgment in light of the ore tenus standard of review. See Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994). However, for the reasons set forth above, we must conclude that "the evidence so fails to support" the juvenile court's judgment modifying custody of the child "that it is plainly and palpably wrong." K.U., 196 So.3d at 268. Accordingly, that decision must be reversed.
Conclusion
The judgment of the Court of Civil Appeals affirming the juvenile court's judgment modifying custody of the child is reversed and the cause remanded for further proceedings.
REVERSED AND REMANDED.
Stuart, C.J., and Bolin, Parker, Murdock, Shaw, Main, Wise, and Sellers, JJ., concur.

The stepgrandmother gave this testimony at a hearing conducted on June 15, 2016.

The mother did not cross-examine the stepgrandmother.

Although it is clear from the record that the mother's 6-month-old daughter is the child's half sister, it is unclear whether the mother's 11-year-old son is the child's brother or half brother.